Filed 7/5/17

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR


| | |
|---|---|
| JOSEPH PETITPAS,<br><br>        Plaintiff and Appellant,<br><br>        v.<br><br>FORD MOTOR COMPANY et al.<br><br>        Defendants and Respondents. | B245037<br><br>(Los Angeles County<br>Super. Ct. No. BC473216<br>JCCP4674) |


        APPEAL from a judgment of the Superior Court of
Los Angeles County, Emilie Elias and Richard Fruin, Judges.
Affirmed.
        The Arkin Law Firm, Sharon J. Arkin; Farrise Firm;
Simona A. Farrise for Plaintiff and Appellant.
        Dykema Gossett, John M. Thomas, Jill M. Wheaton and
Tamara A. Bush for Defendant and Respondent Ford Motor
Company.
        McKenna Long & Aldridge, Jayme C. Long, Frederic W.
Norris and David K. Schultz; Theodore J. Boutrous for Defendant
and Respondent Exxon Mobil Corporation.

Selman Breitman, Brad D. Bleichner, Jerry C. Popovich and Dennis M. Alexander for Defendant, Respondent and Intervenor Fireman's Fund Insurance Company.

Plaintiffs Marline Petitpas[1] and Joseph Petitpas sued Ford Motor Company, Exxon Mobil Corporation, Rossmoor Corporation,[2] and others, alleging that exposure to asbestos caused by these defendants resulted in Marline's mesothelioma. Motions for summary adjudication were granted before trial, narrowing the claims against Exxon and Ford. During trial, the court granted nonsuit for Rossmoor. The jury returned defense verdicts for Exxon and Ford.

Plaintiffs assert five contentions on appeal. First, they argue that the trial court erred by granting summary adjudication in favor of Exxon as to strict product liability and secondary, or "take home," exposure. Second, they contend that the trial court erred by granting nonsuit for Rossmoor as to both direct and secondary exposure. Third, plaintiffs maintain that the trial court failed to properly instruct the jury regarding design defect issues involving Ford. Fourth, plaintiffs argue that

[1]. Because plaintiffs share a last name, we refer to them individually by their first names for clarity and intend no disrespect. Marline passed away while this appeal was pending. We granted the unopposed motion seeking to substitute Joseph as Marline's successor-in-interest in this action. We refer to Joseph in both his individual and representative capacity as plaintiffs.

[2] Rossmoor Corporation has been dissolved, and therefore Fireman's Fund Insurance Company intervened below and is a respondent in this appeal. We refer to this party as "Rossmoor."

the trial court erred by granting summary adjudication in favor of Ford as to plaintiffs' punitive damages claims. Finally, plaintiffs assert that the jury verdict in favor of Exxon was not supported by the evidence.

We affirm on all challenged grounds. First, summary adjudication for Exxon appropriately was granted because the evidence did not show that Exxon was within the stream of commerce for any asbestos-containing products, and Exxon did not have a duty to Marline regarding secondary exposure because Marline was not a member of Joseph's household at the relevant time. Second, nonsuit as to Rossmoor was appropriate because the causation evidence against Rossmoor presented at trial was insufficient to support a verdict for plaintiffs. Third, jury instructions relating to Ford accurately reflected the law, and Ford was not liable under a design defect theory for products it did not manufacture or supply. Fourth, because we affirm the defense verdict in favor of Ford, plaintiffs' challenge to the summary adjudication of punitive damages claims against Ford is moot. Finally, since plaintiffs have not demonstrated that they were entitled to a verdict in their favor as to Exxon as a matter of law, there is no basis for reversing the defense verdict in favor of Exxon.

## I.

Plaintiffs filed a complaint against more than 30 defendants alleging that Marline developed mesothelioma as a result of exposure to asbestos-containing products. Against all defendants, plaintiffs alleged causes of action for negligence and strict liability based on alleged exposure to the defendants' products. Plaintiffs also asserted premises liability claims against Exxon, Rossmoor, and others, alleging that Joseph

3

worked on premises owned by those defendants, where "he was exposed to asbestos products and dust from asbestos products and consequently exposed" Marline. Joseph also alleged loss of consortium.

Marline's alleged exposure to asbestos stemmed from many sources and spanned several years. The evidence presented in pretrial motions and at trial is discussed in detail below. In short, plaintiffs allege that Marline suffered from both direct exposure and secondary exposure to asbestos-containing dust. They assert that the direct exposures occurred when Marline visited Joseph while he worked at an Enco service station owned by Exxon, from Joseph's work on Ford vehicles at the Enco station and at home while Marline was present, from exposure to dust when Marline visited a Rossmoor construction site, and from drywall compound and stucco in two of plaintiffs' homes built by defendant Shea Homes, which is not a party to this appeal. As for secondary exposure, plaintiffs allege that Marline was exposed to asbestos-containing dust that collected on Joseph's clothing while Joseph worked at the Enco station, as he worked on Ford vehicles at home, and when he visited construction sites as part of his work as an architectural drafter at Rossmoor.

## A. Summary adjudication in favor of Exxon

### 1. *Motion, opposition, and trial court ruling*

Joseph and Marline testified in their depositions that they met while Joseph was working at an Enco service station in Pomona. Exxon's predecessor, Humble Oil, owned the Enco service station at the relevant time. Marline visited Joseph at work in 1966 and 1967, while Joseph worked on automotive friction products: brakes, clutches, and gaskets. Marline was present when Joseph used compressed air to clean brake drums,

4

and as he swept the service bays before closing. Occasionally, Marline was present when a mobile brake service van was on site preparing brakes for installation. Plaintiffs alleged that these activities directly exposed Marline to airborne asbestos. Joseph said in his deposition that auto parts used at the Enco station came from independent auto parts suppliers or the mobile brake service.

Joseph briefly worked at a different Enco service station in Ontario in 1968, and Marline also visited him there. Joseph also worked at an Enco service station in Pleasanton in 1970 and 1971, after he and Marline were married. In Pleasanton, Marline laundered Joseph's work pants and came into contact with his clothing.[3]

Exxon argued that summary adjudication should be granted on two separate bases that plaintiffs challenge on appeal. First, Exxon argued that it could not be liable under plaintiffs' strict product liability theory because plaintiffs "have no evidence, and cannot reasonably obtain evidence, that Mrs. Petitpas was indirectly or secondarily exposed to asbestos from an asbestos-containing product manufactured, distributed, or sold by Exxon." Exxon submitted undisputed evidence showing that at the Pomona Enco station, asbestos-containing replacement clutches and gaskets came from an independent auto parts store, and asbestos-containing replacement brakes were supplied by the mobile brake service. None of these products was manufactured by Exxon. Exxon argued that because it supplied these parts only through the provision of automotive services, not as a seller or retailer of parts, it could

---

[3] The parties agreed that the Pomona Enco station was the only one relevant to plaintiffs' product liability claims.

not be strictly liable because it was not within the stream of commerce.

Second, Exxon argued that it did not have a duty to protect Marline from secondary exposure from "allegedly toxic materials that are carried off the premises on the clothing of an employee." Citing *Rowland v. Christian* (1968) 69 Cal.2d 108 and *Oddone v. Superior Court* (2009) 179 Cal.App.4th 813 (*Oddone*), Exxon argued that as a matter of law it did not have a duty to prevent a non-employee's secondary exposure to asbestos.

After Exxon's motion was filed, the Court of Appeal decided *Campbell v. Ford Motor Co.* (2012) 206 Cal.App.4th 15 (*Campbell*). The plaintiff in *Campbell* alleged she developed mesothelioma as a result of asbestos exposure from laundering her father's and brother's clothing during the time they worked as independent contractors installing asbestos insulation at a Ford plant. (*Id.* at p. 19.) The *Campbell* court considered "whether a premise[s] owner [Ford] has a duty to protect family members of workers on its premises from secondary exposure to asbestos used during the course of the property owner's business." (*Id.* at p. 29.) The court concluded that "a property owner has no duty to protect family members of workers on its premises from secondary exposure to asbestos used during the course of the property owner's business." (*Id.* at p. 34.)

Plaintiffs opposed Exxon's motion. They argued Exxon knew in the 1930's that asbestos exposure was hazardous, and it took steps to minimize refinery workers' exposure to asbestos. Because of this knowledge, plaintiffs argued, "a 'reasonably thoughtful' employer would not only have protected its employees from the risk of asbestos exposure, but would have protected its employees' household members who would be subjected to that

6

exposure from the asbestos debris taken home to the household." Plaintiffs contended that *Campbell* was wrongly decided.

Plaintiffs also argued that Exxon failed to shift the burden on the product liability causes of action because it did not present evidence showing that the Enco station did not sell asbestos-containing auto parts. Automotive repair and maintenance facilities usually charge for both parts and services, plaintiffs asserted, and Exxon failed to provide evidence that it did not engage in such a practice.

At the hearing on the motion, after argument from the parties, the court granted Exxon's motion for summary adjudication as to strict product liability and secondary exposure. On appeal, plaintiffs assert that the trial court erred in granting on both bases. We address each below.

2.     *Standard of review*

On appeal following a motion for summary adjudication, "'[w]e review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained.' [Citation.]" "We liberally construe the evidence in support of the party opposing summary [adjudication] and resolve doubts concerning the evidence in favor of that party." (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037.)

"A defendant moving for summary judgment or summary adjudication need not conclusively negate an element of the plaintiff's cause of action. (Code Civ. Proc., § 437c, subd. (f)(2); *Aguilar* [*v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826,] 853, 107 Cal.Rptr.2d 841, 24 P.3d 493 [(*Aguilar*)].) Instead, the defendant may show through factually devoid discovery responses that the plaintiff does not possess and cannot reasonably obtain needed

7

evidence." (*Collin v. CalPortland Company* (2014) 228 Cal.App.4th 582, 587-588.) "After the defendant meets its threshold burden, the burden shifts to the plaintiff to present evidence showing that a triable issue of one or more material facts exists as to that cause of action or affirmative defense. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar*, *supra*, 25 Cal.4th at p. 850, [107 Cal.Rptr.2d 841, 24 P.3d 493].) The plaintiff may not simply rely on the allegations of its pleadings but, instead, must set forth the specific facts showing the existence of a triable issue of material fact. (Code Civ. Proc., § 437c, subd. (p)(2).) A triable issue of material fact exists if, and only if, the evidence reasonably permits the trier of fact to find the contested fact in favor of the plaintiff in accordance with the applicable standard of proof. (*Aguilar, supra,* 25 Cal.4th at p. 850, [107 Cal.Rptr.2d 841, 24 P.3d 493].)" (*Collin, supra*, 228 Cal.App.4th at p. 588.)

3. *Summary adjudication of strict product liability claims against Exxon*

As an initial matter, plaintiffs argue that summary adjudication should have been denied. Plaintiffs contend that Exxon failed to meet its summary adjudication burden because the evidence Exxon submitted with its motion was insufficient to prove that Exxon did not supply asbestos-containing vehicle parts. "[T]he party moving for summary [adjudication] bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact." (*Aguilar, supra,* 25 Cal.4th at p. 850.) "When a defendant seeking summary judgment submits the plaintiff's . . . deposition testimony indicating the plaintiff does not possess any evidence to support one or more elements of the plaintiff's claim, the burden shifts to the plaintiff to present evidence sufficient to

8

raise a triable issue of material fact.  [Citation.]"  (*Sweeting v. Murat* (2013) 221 Cal.App.4th 507, 514 fn. 8.)

California cases have found that a defendant involved in the marketing/distribution process may be held strictly liable "if three factors are present:  (1) the defendant received a direct financial benefit from its activities and from the sale of the product; (2) the defendant's role was integral to the business enterprise such that the defendant's conduct was a necessary factor in bringing the product to the initial consumer market; and (3) the defendant had control over, or a substantial ability to influence, the manufacturing or distribution process.  [Citation.]"  (*Bay Summit Community Assn. v. Shell Oil Co.* (1996) 51 Cal.App.4th 762, 776 (*Bay Summit*).)  In addition, "strict liability is not imposed even if the defendant is technically a 'link in the chain' in getting the product to the consumer market if the judicially perceived policy considerations are not satisfied.  Thus, a defendant will not be held strictly liable unless doing so will enhance product safety, maximize protection to the injured plaintiff, and apportion costs among the defendants."  (*Arriaga v. CitiCapital Commercial Corp.* (2008) 167 Cal.App.4th 1527, 1537.)  "The application of strict liability in any particular factual setting is determined largely by the policies that underlie the doctrine."  (*Taylor v. Elliott Turbomachinery Co., Inc.* (2009) 171 Cal.App.4th 564, 576.)

Exxon met its summary adjudication burden here. Exxon stated in its separate statement that Joseph "replaced brakes, clutches and head gaskets at the Pomona Enco station," and that "the replacement clutches and gaskets used at the Enco station came from a local independent auto parts stores [*sic*]."  It also stated that replacement brakes "were obtained from a mobile

9

brake service company which not only provided brakes but also came to the station to do brake work." With its motion, Exxon submitted excerpts from Joseph's deposition to support these statements. This evidence was sufficient to support an inference that Enco was not primarily in the business of supplying asbestos-containing vehicle parts. Because the Enco station was able to complete vehicle repairs with asbestos-containing parts only through the use of the mobile brake service or with parts purchased from auto parts stores, defendants demonstrated that the Enco station did not generally stock these parts for sale to consumers. In addition, Joseph stated in his deposition that the workers at the Enco station installed the parts as part of its repair and maintenance services. This evidence, and the inferences that can be drawn from it, was sufficient to meet Exxon's burden under *Aguilar*.

Plaintiffs also assert that even if the summary adjudication burden had been shifted, the motion should have been denied because there was a triable issue of fact as to whether Exxon played a role in the stream of commerce for these parts, and therefore summary adjudication on strict product liability was unwarranted. Plaintiffs assert that Exxon's evidence did not constitute "actual proof" that the brake service company, rather than Exxon, was the supplier or seller of the brakes. Plaintiffs also argue there was no evidence "that Exxon did not sell [replacement] parts but merely included them as part of the cost of the services provided." Plaintiffs point to Joseph's deposition, in which he said the Enco station displayed motor oil, windshield wipers, dust rags, transmission fluid, brake fluid, and perhaps tires and fan belts. Plaintiffs argue that this "evidence demonstrates that the Exxon station was in the business of

10

selling vehicle parts and supplies and frequently supplied its customers with replacement brakes, clutches and engine gaskets."

Because this case involves strict liability for products causing exposure to asbestos, however, the relevant question is not whether the Enco station sold parts such as oil and windshield wipers to customers, but instead whether Exxon was within the stream of commerce for automotive parts that may have exposed Marline to asbestos. In supplemental briefing, Plaintiffs argue that our recent decision in *Hernandezcueva v. E.F. Brady Company, Inc.* (2015) 243 Cal.App.4th 249 (*Hernandezcueva*) supports reversal of Exxon's motion for summary adjudication of plaintiffs' strict liability claims.[4] *Hernandezcueva*, the plaintiff was a janitor at an industrial building complex. Defendant E.F. Brady was a drywall subcontractor that helped build the complex in the 1970's. The plaintiff was diagnosed with mesothelioma, and alleged that E.F. Brady supplied and installed drywall and related products that included asbestos. (*Id.* at p. 253-254.) The trial court granted a partial nonsuit on the plaintiff's strict liability claims, and we

---

[4] Exxon correctly points out that plaintiffs failed to cite legal authority in their opening brief supporting their arguments as to strict product liability against Exxon. Every appellate brief must "support each point by argument and, if possible, by citation of authority." (Cal. Rules of Court, rule 8.204(a)(1)(B).) When an appellant asserts an argument but fails to support it with reasoned argument and citations to authority, we may treat the point as waived. (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785.) We nonetheless exercise our discretion to consider plaintiffs' arguments about the effect of our recent decision in *Hernandezcueva, supra.*

reversed. We discussed the stream-of-commerce theory of strict product liability (see *id*. at pp. 257-258), and noted that "'[s]ervices, even when provided commercially, are not products.'" (*Id*. at p. 259, quoting Rest. 3d Torts, § 19, subd. (b).) We said, "[W]hen injury arises from a component integrated in another product, the imposition of strict liability on a party hinges on its role in the relevant transaction. Generally, manufacturers and suppliers of a component to be integrated into a final product may be subject to strict liability when the component itself causes harm." (*Id*. at p. 259.) On the other hand, "parties involved in passing a defective component to the ultimate user or consumer are not subject to strict products liability when their sole contribution to the pertinent transaction was a service, namely, the installation of the component into the pertinent final product." (*Ibid*.) Therefore, "[t]he propriety of imposing strict liability on a party that both supplies and installs a defective component hinges on the circumstances of the transaction." (*Id*. at p. 260.)

In *Hernandezcueva*, the evidence presented at trial showed that "E.F. Brady was a large drywall installation firm whose relevant contracts *always* involved the provision of drywall and related materials." (*Hernandezcueva, supra*, 243 Cal.App.4th at p. 263.) In other words, providing drywall to customers constituted a substantial portion of E.F. Brady's business. E.F. Brady also had significant, ongoing relationships with two different drywall manufacturers, which were "sufficient to command the personal attention of" both companies' representatives when E.F. Brady had some problems with one brand of drywall compound while working on the job at issue. (*Id*. at p. 263.) This type of relationship is relevant in a strict

12

liability context, because it speaks to the defendant's "position to enhance product safety or exert pressure on the manufacturer to promote" a product. (*Id.* at p. 262.) Based on this evidence, "a jury could reasonably find that E.F. Brady was more than an 'occasional seller' of drywall and joint compounds." (*Id.* at pp. 262-263.)

Exxon argues that the holding in *Hernandezcueva* reinforces earlier strict liability cases, and supports its argument that summary adjudication of plaintiffs' strict liability claims was appropriate. Exxon also contends that none of the factors supporting a finding of strict liability in *Hernandezcueva* exist in this case. We agree that the evidence here is dissimilar to that in *Hernandezcueva* and that reversal is not warranted.

The evidence here does not indicate that supplying asbestos-containing gaskets, clutches, and brakes was a central part of the Pomona Enco station's business. Joseph's testimony showed that the Enco station did not supply brake parts. Instead, a mobile brake service came to the Enco station, supplied brake parts, and performed services relating to those parts such as turning brake drums and arcing brake linings. In addition, Joseph's testimony demonstrated that providing gaskets and clutches was not a significant portion of the Pomona Enco station's business. Joseph said that in the year he worked at the Pomona Enco station, clutch replacements were done rarely, less than once per month. In that year, he and the other mechanics performed two to three engine rebuilds involving gaskets. Joseph rebuilt carburetors using gaskets about once per month. This evidence of sporadic work with asbestos-containing parts does not support a finding that supplying asbestos-containing parts was a primary aspect of the Enco station's business.

13

Moreover, Joseph testified that the Enco station obtained gaskets and clutch parts from local auto parts stores. There is no suggestion in the record that the Enco station managers or Exxon had any direct relationship with the parts manufacturers. As previous cases have noted, a relationship between the defendant and the manufacturer is a significant consideration in a strict liability analysis. In *Hernandezcueva*, for example, E.F. Brady had an ongoing relationship with the drywall manufacturer that was significant enough to exert pressure on the manufacturer to influence product safety. (*Hernandezcueva, supra*, 243 Cal.App.4th at p. 263.) In *Kasel v. Remington Arms Co.* (1972) 24 Cal.App.3d 711, 725, the court noted that an "individual defendant's control over the cause of defect in the product" is not determinative, but is a "significant factor" in a strict liability analysis. And the court in *Bay Summit, supra,* 51 Cal.App.4th at p. 776, said that strict liability may be appropriate where "the defendant had control over, or a substantial ability to influence, the manufacturing or distribution process." The evidence here offers no suggestion that such a relationship existed between Enco or Exxon and the manufacturers of asbestos-containing auto parts.

This case is more like *Monte Vista Development Corp. v. Superior Court* (1991) 226 Cal.App.3d 1681, in which the plaintiff alleged that a ceramic soap dish installed with her home's bathtub tile was defective and broke, causing a severe laceration. Defendant Willey Tile was a subcontractor that installed the tile and soap dishes in the plaintiff's home and other homes in that development. Willey Tile selected and purchased the soap dish in bulk from a supplier. The trial court granted summary adjudication on plaintiff's strict liability claims against Willey

14

Tile, and the Court of Appeal affirmed. The appellate court said, "The focus of our analysis is . . . whether the tile company came within the chain of commerce as a supplier of the soap dish to the extent that it became strictly liable if the item was defective. We conclude liability should not be extended under these circumstances." (*Monte Vista, supra*, 226 Cal.App.3d at p. 1687.) The court explained, "Willey Tile was not in the business of selling soap dishes or any other fixtures. It purchased the soap dish that injured plaintiff, as well as other fixtures, in order to complete its subcontract with Monte Vista [the developer]. Obviously, it mattered not to Willey Tile whether Monte Vista or someone else supplied the tile fixtures." (*Ibid.*)

Similarly, in *Endicott v. Nissan Motor Corp.* (1977) 73 Cal.App.3d 917, the Court of Appeal affirmed nonsuit for a seat belt installer who was not in the stream of commerce. The plaintiff alleged that his seat belt failed in a car accident, contributing to injuries. (*Endicott, supra*, 73 Cal.App.3d at p. 923-924.) An independent contractor installed the seat belts: "When a vehicle arrived in California, its belts were already in the trunk of the vehicle, and the locations for their installation were marked. Installer's employees took the belts out of the trunk and attached them to the vehicle according to the manufacturer's directions. The manufacturer supplied all materials for attaching the belts." (*Id.* at p. 925.) The Court of Appeal held that nonsuit for the installer was appropriate. "[W]e find no evidence that Installer was an integral part of the overall marketing enterprise that produces Datsun automobiles or that it played any significant role in placing Datsun's product in the stream of commerce that could render Installer liable in tort for defects in Datsun's automobiles. [Citation.] As a mere provider

15

of services Installer is not liable for defects in the product." (*Id.* at p. 930.)

Here, the Enco station was in a similar situation. If a customer needed a clutch facing or gasket, the Enco station needed to purchase one that fit the particular make and model of the vehicle. There is no suggestion in the record that Joseph, other Enco station workers, or Exxon had any control over which clutch parts or gaskets could be used to complete these repairs or whether those parts were made with asbestos. The evidence therefore shows that the Enco station was a "provider of services" rather than a seller or distributor of asbestos-containing vehicle parts.

In sum, the evidence submitted with Exxon's motion for summary adjudication was sufficient to shift the burden to plaintiffs under *Aguilar*. Plaintiffs' evidence does not support a finding that there was a triable issue of fact as to whether the Enco station or Exxon was within the stream of commerce for asbestos-containing vehicle parts to the extent that strict liability is warranted. Summary adjudication on plaintiffs' strict liability claims against Exxon was properly granted.

4. *Summary adjudication of secondary exposure claims relating to Exxon*

Plaintiffs also argue that the court erred by granting summary adjudication of their claims against Exxon based on Marline's secondary exposure to asbestos. The trial court granted summary adjudication based on the reasoning of *Campbell*, which held that "a property owner has no duty to protect family members of workers on its premises from secondary exposure to asbestos used during the course of the

16

property owner's business." (*Campbell*, *supra*, 206 Cal.App.4th at p. 34.)

While this appeal was pending, the Supreme Court disapproved *Campbell* and *Oddone* in *Kesner v. Superior Court* (2016) 1 Cal.5th 1132 (*Kesner*). In *Kesner*, the Court held, "[T]he duty of employers and premises owners to exercise ordinary care in their use of asbestos includes preventing exposure to asbestos carried by the bodies and clothing of on-site workers. Where it is reasonably foreseeable that workers, their clothing, or personal effects will act as vectors carrying asbestos from the premises to household members, employers have a duty to take reasonable care to prevent this means of transmission." (*Kesner*, 1 Cal.5th at p. 1140.) The Court was very specific that this duty extended only to members of the employee's household: "We hold that an employer's or property owner's duty to prevent take-home exposure extends only to members of a worker's household, i.e., persons who live with the worker and are thus foreseeably in close and sustained contact with the worker over a significant period of time." (*Id.* at pp. 1154-1155.) Although other people might regularly have contact with a worker whose clothing carries asbestos fibers, the Court's foreseeability analysis relied "on the fact that a worker can be expected to return home each work day and to have close contact with household members on a regular basis over many years." (*Id.* at p. 1155.) Limiting liability to household members "strikes a workable balance between ensuring that reasonably foreseeable injuries are compensated and protecting courts and defendants from the costs associated with litigation of disproportionately meritless claims." (*Ibid*.)

17

We asked the parties for further briefing to address the effect of *Kesner* on plaintiffs' assertions that summary adjudication in favor of Exxon on the issue of secondary exposure should be reversed. Plaintiffs acknowledge in their supplemental briefing that "Marline and Joseph were not married and did not live together at the time Joseph worked at the Exxon station and thus technically were not members of the same household." Plaintiffs ask us to hold that Exxon had a duty to Marline nevertheless, contending that "Marline's status is close to that of a household member" because she and Joseph hugged, kissed, and went places in Joseph's car while Joseph was wearing his work clothes. Plaintiffs thus ask us to remand for "a trial on the issue of whether Marline's exposures as a result of her close, personal contact with Joseph were factually similar to the status of a household member."[5]

We decline to expand *Kesner*'s duty to apply to a non-household member. The *Kesner* Court was very specific in limiting the duty to non-employees "only to members of a worker's household, i.e., persons who live with the worker." (*Kesner*, *supra*, 1 Cal.5th at pp. 1154-1155.) The Court recognized that maintaining this limitation on the scope of the duty was important: "We are mindful that recognizing a duty to all persons who experienced secondary exposure could invite a mass of litigation that imposes uncertain and potentially massive and uninsurable burdens on defendants, the courts, and society." (*Id*. at p. 1156.) Inviting a trial to determine whether a non-

---

[5] Plaintiffs do not argue that Exxon should be liable under *Kesner* for take-home exposure relating to Joseph's work at the Enco station in Pleasanton after plaintiffs were married. We therefore do not consider *Kesner*'s effect on this alleged exposure.

18

household member's contact with the employee was "similar to the status of a household member" appears to be exactly what the Supreme Court was attempting to avoid with this bright-line rule.

Because Marline was not a member of Joseph's household when Joseph worked at the Enco station in Pomona, Exxon did not have a duty to Marline with respect to secondary asbestos exposure. Summary adjudication in favor of Exxon is therefore affirmed.

## II.

Trial began against defendants Union Carbide, Shea Homes, Rossmoor, Ford, and Exxon. Union Carbide and Shea Homes settled with plaintiffs during the course of the trial, the trial court granted nonsuit for Rossmoor, and Ford and Exxon proceeded to verdict. The evidence summarized below was presented at trial.

### A.     Enco service station and Joseph's work on Ford cars

Joseph and Marline both testified at trial. Joseph testified that he worked at an Enco gas and service station, operated by Exxon,[6] in Pomona from 1966 to 1967. Joseph and Marline met in 1966 at the Enco station, and after they began dating, Marline visited Joseph while he worked there several days a week. She sat in the service bay where mechanics worked on cars. Marline continued to visit Joseph at work for about a year and a half, until Joseph was drafted into the Army. Marline estimated that her visits ranged from 20 minutes to several hours.

The cars that came into the Enco station in that time period were mostly American-made cars: about 40 percent

_____

[6] At trial the parties stipulated that defendant Exxon was known or did business as Enco and Humble Oil.

19

General Motors models, 40 percent Ford models, and the rest other makes.  Joseph did a variety of work on Ford cars, including brake inspections and replacements.  He did brake inspections two or three times a day, and brake replacements two or three times a week.  About 40 percent of these inspections and replacements were on Ford cars.

Joseph used an air compressor to blow dust out of wheel assemblies to check or change brakes.  Marline estimated that she watched Joseph do brake work on a total of seven to ten cars at the Enco station, and she could not identify the make or model of any of those cars.  Marline observed that when Joseph did brake work, it created dust, and she breathed that dust.  Marline also watched Joseph clean up at the end of the day, which involved blowing or sweeping the floor, which created dust, and Marline breathed the dust.

A mobile brake service came to the Enco station once or twice a week to turn brake drums and arc brake linings.[7]  Arcing the brake linings created airborne dust. Joseph often was in or near the mobile brake van while this work was being done.  Marline testified that she approached the mobile brake van either once or several times, and she testified that she breathed the dust the work created.  Some cars that went to the Enco station had brakes stamped with "FoMoCo," indicating original Ford-installed brakes.  The replacement brakes used by the brake van and by Joseph when he worked at the Enco station were Raybestos or Bendix brakes.

---

[7] Joseph testified that this work was done when brake drums became warped from use, or to fit brake linings better within a brake drum to ensure a smooth braking surface.

Joseph wore a uniform shirt to work, and the service station provided a cleaning service for the uniform shirts; once a week Joseph brought his shirts in and the company had them cleaned. Joseph usually wore his uniform shirt when he went out with Marline after work. Marline did not wash Joseph's clothing when they were dating.

Joseph was drafted into the Army in early 1968, and moved to Fort Carson, Colorado after basic training. He and Marline married and lived together in Fort Carson. Joseph worked part-time at a Chevron service station in Fort Carson in 1968 and 1969, doing the same type of work he had done at the Enco station. Joseph testified that Marline came to visit him at that service station as well. After Marline and Joseph moved back to California in 1970, Joseph worked part-time at another Enco station for a year or slightly longer. Joseph did the same type of service work there that he did at the other service stations. During this time period, Marline washed Joseph's clothing.

Joseph testified that he also worked on his family's cars at home after 1972. He did a brake inspection on their 1964 Ford Falcon Ranchero in their home garage. Joseph did two or three brake changes on their 1976 Ford Ranchero, and a 1984 Ford van. Joseph also did brake inspections on his father's 1977 Ford Thunderbird. Sometimes Marline was in the home garage working on crafts or doing laundry as Joseph worked on the cars, and she testified that she breathed dust that arose from Joseph's work. Marline also testified that during this period she did Joseph's laundry after he worked on vehicles, and she breathed the dust that was on his shirts.

Joseph used Raybestos and Bendix replacement brakes on these cars. Plaintiffs presented part of a 1989 deposition

21

transcript of Arnold Anderson, a Ford engineer, who testified that Ford did not make the brake linings that were in Ford cars. Instead, Ford would "buy brakes, brake assemblies from the brake system suppliers who buy the linings from lining vendors." Anderson testified that he tested the brake linings supplied to Ford by different vendors, and all brands of brake linings he tested contained chrysotile asbestos.

Plaintiffs also presented an interrogatory response from Ford, stating that some Ford vehicles prior to the 1980's included asbestos-containing brake linings, brake pads, and clutch facings, and that these component parts were purchased from third-party suppliers. In addition, the interrogatory response said that Ford sold asbestos-containing replacement parts under the Ford brand, although those parts were purchased from non-Ford suppliers.

## B.    Joseph's work at Rossmoor

Before nonsuit was granted as to Rossmoor, the following evidence was presented at trial. In 1971, Joseph began working at Rossmoor as an architectural drafter, drawing plans for construction projects. At the time, Rossmoor was building Leisure World, a large retirement community consisting of houses, condominiums, and high-rise buildings. As a drafter, Joseph worked primarily in an office. After he had been at Rossmoor for six months to a year, he began visiting the construction site as part of his work. He usually left the office first thing in the morning to visit the construction sites, where he answered questions and responded to building inspectors. He typically spent half an hour to an hour and a half at the site, and spent the rest of the day in his office. At first he drove to the site in his own car, and later he used a company car available for that

purpose. Joseph testified that the Leisure World construction used gypsum drywall, joint compound, textured ceiling material, and stucco. Plaintiffs' expert Richard Hatfield testified that these materials typically contained asbestos.[8]

Plaintiffs owned one car, and once or twice a week Marline drove Joseph to work in the morning and picked him up in the evening. When Marline picked up Joseph, they typically hugged each other. After they bought a house nearby in 1972, Joseph sometimes came home for lunch.

Joseph testified that before he left a construction site he might stomp his feet or brush off his pants if he was dusty, but it was "very possible" that dust from the construction site might be on his lower pants at the end of the day. Plaintiff's counsel asked Hatfield whether Marline could be exposed to asbestos if Joseph had been at a construction site and he could "see like white powder, I don't know, six inches or a foot up his leg," and he brushed it off in Marline's presence. Hatfield testified that exposure could occur in that manner. Plaintiffs' counsel also asked Hatfield whether exposure could occur if Joseph was at a dusty work site and got dust on his shirt and pants, then Marline "comes to pick him up, she drives onto the site," and Joseph hugged Marline. Again Hatfield said that scenario could expose Marline to asbestos. On cross-examination, Hatfield said that if Joseph picked up dust on his clothes at the construction site in the morning and then worked the rest of the day at his office, there was no way to say with any scientific certainty whether Joseph exposed Marline to asbestos.

---

[8] Hatfield's specific area of expertise is unclear from the record, but he testified that he is a geologist, microscopist, and "know[s] a lot about the industrial hygiene of asbestos."

Joseph testified that during this time period Marline washed some of Joseph's shirts, socks, and underclothes; Joseph's slacks and ties were dry cleaned. Hatfield said that if Marline were to shake visible dust out of Joseph's clothing when she laundered it, that could result in exposure. Neither Joseph nor Marline testified that Marline shook visible dust out of the clothing Joseph wore to work at Rossmoor.[9]

Joseph occasionally showed Marline the partially completed buildings when the work had finished for the day and "nobody was around." When Marline visited the construction sites, no active construction work was being done. Joseph testified, "I wouldn't say she was there during the day when that action [construction] was going on . . . but after, late in the afternoon or when she picked me up, we'd swing out there maybe on a Saturday. So yes, those activities were going on, but not at that moment." Marline agreed that she was "never on any one of the construction sites while the construction workers were there performing construction work." Marline occasionally saw construction materials on the floors of these partially completed buildings, but she could not recall seeing any dust.

## C. Marline's other exposures to asbestos-containing materials

Union Carbide and Shea Homes also were defendants at the start of the trial.[10] Plaintiffs' counsel explained in opening

[9] At one point Marline testified that she would shake out the clothing Joseph wore while working on Ford cars, but none of the parties have pointed us to any evidence that Marline shook dust from the clothing Joseph wore while working at Rossmoor.

[10] Because these defendants were dismissed before trial was completed, some of the evidence pertaining to these exposures, related causation, and defenses was not fully

24

statements that Union Carbide supplied asbestos for a joint compound manufactured by Hamilton Materials (Hamilton) that was used at construction sites where Joseph worked.  Union Carbide was dismissed from the case after several days of trial.

Joseph and Marline bought a new home in 1972 in Mission Viejo from the predecessor to defendant Shea Homes.  They first purchased a lot in a tract of homes, and visited the house as it was being built.  They went to the construction site in the evenings and cleaned up after the construction crew, sweeping up drywall dust and throwing away trash.  They also were present when construction was occurring.  The construction created visible dust which they breathed.  Joseph testified that defendant Hamilton made the joint compound used in the construction of the home.  It created dust when it was sanded.  Hatfield testified that a neighboring home built at the same time with the same materials was later tested for the presence of asbestos, and its stucco, acoustical ceilings, and joint compound were found to contain asbestos.

Plaintiffs also built some block walls at the Mission Viejo house, using Merlex stucco to cover the walls.  The stucco came as a powder, which they poured into a wheelbarrow and mixed with water.  Joseph also drilled into the stucco on the house to hang gates and build a patio roof; Marline was with him as he did this and helped him.  Joseph testified that because Marline was an artist, they hung her art around the house by making holes in

---

developed.  Nonetheless, the jury heard some information about Marline's exposures to asbestos from these sources.  Because the jury's causation finding is at issue on appeal, we include a brief summary of this evidence here.

the drywall. Hatfield testified that these activities could result in exposure to asbestos dust.

In 1977, plaintiffs bought a new home in Lake Forest, California. As with the Mission Viejo house, plaintiffs purchased this home before it was built and visited the site as construction was being completed. They were present as the drywall was being installed and after it had been sanded, and Joseph testified that a Hamilton joint compound also was used at the Lake Forest house. Plaintiffs built extensive walls and planters around that home using Merlex stucco.

Joseph testified that in 1972 they bought a Chevrolet Monte Carlo, and he did brake inspections and brake changes on the car at home. As noted above, Joseph testified that when he worked on cars at home Marline was sometimes nearby, and she laundered his clothing afterward.

Marline testified that she initially told her doctors that the only asbestos to which she had been exposed was in dental tape she used while employed by an orthodontist. She worked with the asbestos dental tape two to three times in the 1980s, for a few minutes at a time.

Counsel introduced pretrial discovery responses in which Marline stated that she was exposed to asbestos in locations including the Enco service station in Pomona, a Chevron service station where Joseph worked briefly, various homes in California and Colorado, and the orthodontist's office. The discovery responses stated that Marline laundered Joseph's clothing when he worked at the Pomona Enco station, the Chevron station, Rossmoor, and one additional company, although Joseph testified at trial that Marline did not do his laundry while he was working at the Pomona Enco station.

In addition, the discovery responses stated that Marline was exposed to asbestos-containing automobile products supplied or sold by Borg Warner; Morse Tec., Inc.; Dana Companies LLC, formerly known as Spicer Manufacturing Company; El Toro Auto Supply, Inc.; Exxon Mobil Corporation; Ford Motor Company; Genuine Parts Company; Honeywell International, Inc.; Bendix Brakes; Metropolitan Life Insurance Company; National Automotive Parts Association; and Pneumo Abex. The discovery responses also stated that Marline was exposed to asbestos-containing construction-related products supplied or sold by Amcord; California Portland Cement; Dowman Products; Georgia Pacific; Griffith Company; John K. Bice; Kaiser Gypsum; Kelly Moore; Kentile Floors; Merlex Stucco; Metropolitan Life Insurance; William B. March; and Union Carbide Corporation. In addition, in responses to requests for admissions that were read to the jury, plaintiffs admitted that Marline was exposed to asbestos-containing products manufactured or sold by Hamilton Materials and Merlex Stucco Incorporated, and that Marline was exposed to asbestos on the premises of Shapell Homes Incorporated.

**D. Causation evidence**

Plaintiffs presented the expert testimony of pulmonologist Barry Horn, M.D. Dr. Horn testified about numerous studies connecting asbestos and lung disease. He said that if there is visible dust in the air, "[t]hat means there's heavy exposure." He also testified that everyone is exposed to "background" or "ambient" asbestos in the air, but that such exposure is very minor and does not overwhelm the body's defense mechanisms. Dr. Horn testified that asbestos from joint compound, textured ceilings, and brakes can cause disease. Dr. Horn said each

27

exposure to asbestos raised Marline's risk of developing mesothelioma.  On cross-examination, Dr. Horn agreed that several studies found no increased risk of mesothelioma in auto mechanics.

Plaintiffs presented the testimony of Barry Castleman, Sc.D., a public health expert. Dr. Castleman testified that the health hazards relating to the inhalation of asbestos dust were known by 1929.  In the 1930's, industrial hygienists published articles indicating that "asbestosis," or lung scarring disease, "was widespread in manufacturing plants where asbestos was used to make brake linings, and grinding of asbestos brake linings was particularly emphasized in some of these articles." Dr. Castleman also testified that a Dr. Wilhelm Hueper published data in 1965 relating to health hazards of brakes and "brake work."

On cross-examination, Dr. Castleman agreed that much of the asbestos-related research through the 1940's and 1950's was "being done in factories that worked directly with asbestos."  Dr. Castleman testified that he was not aware of any epidemiological studies prior to 1968 showing an increased risk of mesothelioma in mechanics, and by 1969, "there was nothing in print on the measurement of exposure of brake mechanics to asbestos." Counsel for Exxon read to the jury a portion of Dr. Castleman's deposition testimony in which Dr. Castleman stated that to this day, there are no studies "that have any statistical power . . . that speak of the mesothelioma risk of mechanics that do brake repair work."

Plaintiffs presented the 2004 deposition testimony of Dr. Neill Weaver, a cardiologist and former Exxon employee.  Dr. Weaver's testimony is discussed more fully below, but in short he

testified that he worked at a refinery owned by an Exxon predecessor in Baton Rouge from 1951 to 1964, and later became an associate medical director with "primary responsibility for all refining and petrochemical manufacturing" at Exxon and its related companies at the time. Industrial hygiene practices with respect to asbestos were already in place before he began working at Exxon, showing that Exxon knew of the dangers of asbestos exposure. Exxon objected to this testimony because it related to refineries instead of service stations; the court overruled the objections.

A Ford company representative, Mark Taylor, testified about a 1975 study indicating that although dust remained inside a brake drum after use of the brakes, only .02 percent of that dust was chrysotile asbestos because "99.98 percent of the chrysotile asbestos is consumed in the braking . . . operation." Ford engineer Arnold Anderson's 1989 deposition testimony explained that chrysotile asbestos is in a coiled form, and when heated to 650 degrees Celsius, it becomes glassy forsterite, which is "the same chemistry but totally different structure than the original chrysotile."[11] Taylor testified that in 1973, Ford tested

---

[11] Anderson also testified that his studies showed that with use, almost all of the asbestos in brake linings was converted to non-fiber forsterite. The record does not make clear if Anderson and Taylor were discussing results of the same tests. The portion of Anderson's testimony read into the record at trial also was not clear regarding the time period in which Anderson tested brake linings containing asbestos. Anderson's deposition testimony that was read at trial said that "99.87 plus percent" of the chrysotile was converted to forsterite, and that "approximately .03% or less" was fiber bundles. These numbers do not add up to 100 percent and do not match Taylor's numbers, which suggests

asbestos in dust blown out of brake drums with compressed air, and found that the asbestos level in the dust exceeded OSHA requirements. He testified that in about 1975, Ford began advising service mechanics not to blow out brake drums with compressed air.

Defense expert pathologist Victor Roggli, M.D., testified that forsterite "has no disease-producing potential at all." Dr. Roggli also testified that that mesothelioma and other asbestos diseases depend on a dose-response relationship: "The higher the dose, the more likely you are to get the disease." He said that since the 1980's, no study has shown that career brake or auto mechanics are at an increased risk of developing mesothelioma. On cross-examination, Dr. Roggli agreed that he could not rule out exposure to asbestos as a cause of Marline's mesothelioma. He also admitted that there were documented cases of mesothelioma in people whose only known exposure to asbestos was through automotive brake inspection and repair.

William Dyson, Ph.D., a defense industrial hygiene expert, also testified about the dose-response relationship with asbestos. Dr. Dyson testified that "it takes a lot of chrysotile exposure to present a risk of asbestos-related mesothelioma," and Marline's exposure to asbestos at the Enco station was "trivial, inconsequential," because it was "well less than the lowest exposure dose at which we've observed risk in the most sensitive person in the population for exposure to chrysotile and risk of mesothelioma." Dr. Dyson also opined that Joseph's work on vehicles in the family's home garage was insignificant and did not increase the risk to Marline.

_____

either an error or that Anderson and Taylor were discussing different tests.

## E.	Verdict

Before closing arguments, plaintiffs and Shea Homes reached a settlement, and Shea Homes was dismissed from the case.  The case against Exxon and Ford was therefore submitted to the jury.  The jury instructions relevant to the appeal are discussed in a separate section below.

The jury answered the questions on the verdict form as discussed below.  The jury was polled afterward, and the poll numbers are included with the verdict findings:

"Section 1, as to defendant Exxon Mobil Corporation.

"Question No. 1:  Did Exxon Mobil Corporation operate or control an Enco service station where Mr. Petitpas worked during the 1960s?

"Answer:  Yes.  [10-2]

"Question No. 2:  Was Mrs. Petitpas exposed to asbestos dust at the Enco service station?

"Answer:  Yes.  [10-2]

"Question No. 3:  Was Mrs. Petitpas' exposure to asbestos dust at the Enco service station a substantial factor in contributing to her risk of developing mesothelioma?

"Answer:  Yes.  [9-3]

"Question No. 4:  Did Exxon Mobil Corporation know or through the exercise of reasonable care should have known that there was a condition at the Enco station that created an unreasonable risk to Mrs. Petitpas of exposure to asbestos dust?

"Answer:  No.  [12-0]

"[¶ . . . . ¶]

"Section 2, as to defendant Ford Motor Company.

"Question No. 7:  Was Mrs. Petitpas exposed to asbestos dust from Ford original equipment brakes, gaskets or clutches?

31

"Answer: Yes. [11-1]

"Question No. 8: Was Mrs. Petitpas' exposure to asbestos dust from Ford original equipment brakes, gaskets or clutches a substantial factor in contributing to her risk of developing mesothelioma?

"Answer: No. [10-2]"

The court entered judgment in favor of defendants, and plaintiffs timely appealed. Marline passed away on October 21, 2013, while the appeal was pending. Joseph was appointed as her successor-in-interest.

## III.

Plaintiffs assert separate errors relating to Rossmoor, Exxon, and Ford. We discuss each in turn below.

### A.    Rossmoor

1.    *Rossmoor's nonsuit motion*

After plaintiffs rested, Rossmoor moved for nonsuit on several different grounds.[12] Rossmoor asserted that under *Campbell, supra,* 206 Cal.App.4th 15, "there is no duty to protect family members of workers on premises." Rossmoor argued that it was irrelevant whether such exposures occurred "from laundering the clothes, from riding in the same automobile as someone who was directly exposed or giving someone a hug in the parking lot by the office." The court granted nonsuit on *Campbell* grounds for all claims of secondary exposure.

Rossmoor also argued that there was no evidence that Marline was directly exposed to asbestos at the Rossmoor construction site: "[T]here's no testimony that they were at the house at the time that the construction work was going on and/or

---

[12] Rossmoor also moved for nonsuit after plaintiffs' opening statements.

that they were even on the premises at the time that construction work was going on where there was any potential release of asbestos fibers." The court noted, "They said they were not there during construction." Rossmoor's counsel agreed, and said, "Mrs. Petitpas specifically testified that, when she walked into the house, she didn't see any dust."

The court asked plaintiffs' counsel what evidence there was of exposure, in light of the fact that Marline testified that she did not see any airborne dust at the construction sites. Plaintiffs' counsel responded that expert testimony showed "that the nature of respirable asbestos fibers are, in fact, microscopic and invisible to the naked eye." As a result, only specialized testing can demonstrate if there are asbestos fibers in the air. Because the houses were under construction at the time, "that asbestos and asbestos dust, asbestos laden dust was in the structures. And . . . it doesn't go out. So there doesn't need to be someone actively doing work for asbestos exposures to occur."

Rossmoor also asserted that plaintiffs failed to establish medical causation because they had not presented "evidence that Mrs. Petitpas was actually exposed to asbestos-containing materials by Rossmoor Corporation with enough frequency and regularity to show a reasonable medical probability that the exposure was a factor in causing her injury." Rossmoor said the testimony of plaintiffs' medical expert, Dr. Horn, was insufficient to establish that any exposure from Rossmoor was a substantial factor in causing Marline's mesothelioma.

The court granted the motion "on all the grounds raised in the written motion and the oral motion that I've heard." When the jury returned to the courtroom, the judge informed the jury that Rossmoor was no longer in the case.

On appeal, plaintiffs contend that nonsuit in favor of Rossmoor should be reversed on two different grounds.  First, plaintiffs argue that the court's nonsuit as to secondary exposure should be reversed under *Kesner, supra*.  Second, plaintiffs assert that nonsuit as to Marline's direct exposure should be reversed because they presented sufficient evidence to warrant sending the case to the jury.  We address each of these arguments below.

2.     *Standard of review*

In reviewing a judgment of nonsuit, "we must view the facts in the light most favorable to the plaintiff.  '[C]ourts traditionally have taken a very restrictive view of the circumstances under which nonsuit is proper.  The rule is that a trial court may not grant a defendant's motion for nonsuit if plaintiff's evidence would support a jury verdict in plaintiff's favor.  [Citations.]  [¶]  In determining whether plaintiff's evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses.  Instead, the evidence most favorable to plaintiff must be accepted as true and conflicting evidence must be disregarded.  The court must give "to the plaintiff['s] evidence all the value to which it is legally entitled, . . . indulging every legitimate inference which may be drawn from the evidence in plaintiff['s] favor. . . .'" [Citation.]  The same rule applies on appeal from the grant of a nonsuit.  [Citation.]" (*Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1214-1215; see also *O'Neil v. Crane Co.* (2012) 53 Cal.4th 335, 347 (*O'Neil*).)

3.     *Nonsuit for secondary exposure*

The trial court granted Rossmoor's nonsuit for secondary exposure under the reasoning of *Campbell*.  As discussed above, *Campbell* was recently disapproved in *Kesner*.  In their supplemental briefing plaintiffs argue, "Because the trial court

34

granted non-suit in favor of Rossmoor as to Marline's 'take-home' exposures based on its determination that Rossmoor did not owe her a duty as a matter of law under *Campbell*, and given that *Kesner* disapproved *Campbell* on that very issue, reversal and remand for trial against Rossmoor is required."

Rossmoor argues that reversal is not required because although the trial court stated that it granted nonsuit for secondary exposure based on the reasoning of *Campbell*, the court also said, "I'm going to grant the motion for non-suit as to Rossmoor on all the grounds raised in the written motion and the oral motion that I've heard." One basis for nonsuit in Rossmoor's motion was insufficient evidence of causation. Rossmoor argues that plaintiffs "presented no substantial evidence that [Marline] was exposed to asbestos-containing products from the Rossmoor project with such frequency, regularity, and proximity as to satisfy the causation standard articulated in *Rutherford* [*v. Owens-Illinois, Inc*. (1997) 16 Cal.4th 953 (*Rutherford*)], *Hernandez* [*v. Amcord, Inc*. (2013) 215 Cal.App.4th 659], and *Lineaweaver* [*v. Plant Insulation Co.* (1995) 31 Cal.App.4th 1409 (*Lineaweaver*)]."

Plaintiffs reply that "[e]xpert testimony confirmed that those exposures [from Joseph's clothes and in the family car] were sufficient to increase her risk of exposure [*sic*]." They cite pages from the testimony of Dr. Horn, who testified that every asbestos exposure increases the risk of mesothelioma.

"In the context of a cause of action for asbestos-related latent injuries, the plaintiff must first establish some threshold *exposure* to the defendant's defective asbestos-containing products, *and* must further establish in reasonable medical probability that a particular exposure or series of exposures was

35

a 'legal cause' of his injury, i.e., a *substantial factor* in bringing about the injury. . . . [T]he plaintiff may meet the burden of proving that exposure to defendant's product was a substantial factor causing the illness by showing that in reasonable medical probability it contributed to the plaintiff or decedent's *risk* of developing cancer." (*Rutherford, supra,* 16 Cal.4th at p. 982 [italics in original].) "[T]he proper analysis is to ask whether the plaintiff has proven exposure to a defendant's product, of whatever duration, so that exposure is a possible factor in causing the disease and then to evaluate whether the exposure was a substantial factor." (*Lineaweaver, supra*, 31 Cal.App.4th at p. 1416.) "Many factors are relevant in assessing the medical probability that an exposure contributed to plaintiff's asbestos disease," including "[f]requency of exposure, regularity of exposure, and proximity of the asbestos product to plaintiff." (*Ibid*.)

Here, the evidence showed that Joseph worked mostly in an office, and sometimes got dust on the legs of his pants when he visited construction sites. Plaintiffs' expert Hatfield testified that if Joseph was working at a construction site and Marline "drives onto the site" to pick him up, she could be exposed as well. The evidence showed, however, that Marline picked Joseph up from his office, not the construction site. In the time period in which Joseph was at the construction site daily, he was there early in the mornings and usually drove a company car to and from the site.[13]

---

[13] Plaintiffs suggest that asbestos may have contaminated the family car, but they have not pointed us to any testimony suggesting that asbestos-containing dust was in the car and that

Hatfield testified that if Joseph got dust on his clothes at the work sites in the morning and Marline picked him up at his office at the end of the day, there was no telling with a scientific certainty whether Marline was exposed as a result. Although Hatfield testified that shaking visible dust out of clothing before laundering could contribute to exposure that can cause mesothelioma, there was no testimony that Joseph had visible dust on his clothing when he came home, or that Marline shook any such dust from his clothing.

The evidence therefore suggested it was *possible* that Marline was exposed to asbestos from dust on Joseph's clothing, because Joseph was in the presence of dust that may have contained asbestos, and later Marline was in the presence of Joseph. But "[m]ere presence at a site where asbestos was present is insufficient to establish legally significant asbestos exposure." (*Shiffer v. CBS Corporation* (2015) 240 Cal.App.4th 246, 252.) Viewing the evidence in the light most favorable to plaintiffs, the evidence did not make the required connection between asbestos at the Rossmoor work site and Marline's exposure to asbestos from Joseph's clothing. "'While there are many possible causes of any injury, '"[a] possible cause only becomes "probable" when, in the absence of other reasonable causal explanations, it becomes more likely than not that the injury was a result of its action. This is the outer limit of inference upon which an issue may be submitted to the jury."' [Citation.]' [Citation.]" (*Whitmire v. Ingersoll-Rand Co.* (2010) 184 Cal.App.4th 1078, 1084.)

---

Marline was exposed to asbestos when she breathed dust in the car.

In responding to questions about hypothetical scenarios, Hatfield testified that exposure could have occurred if Marline shook visible dust from Joseph's clothing or if Joseph brushed dust off his pants in her presence. However, no one testified that these factual scenarios happened. "[A]n expert's opinion that something could be true if certain assumed facts are true, without any foundation for concluding those assumed facts exist in the case before the jury, does not provide assistance to the jury because the jury is charged with determining what occurred in the case before it, not hypothetical possibilities." (*Jennings v. Palomar Pomerado Health Systems, Inc*. (2003) 114 Cal.App.4th 1108, 1117.)

Plaintiffs argue that Dr. Horn testified that every exposure to asbestos can contribute to the risk of mesothelioma. But "[i]f there has been no exposure, there is no causation." (*McGonnell v. Kaiser Gypsum Co., Inc*. (2002) 98 Cal.App.4th 1098, 1103.) Even assuming Dr. Horn is correct as to the cause of mesothelioma in general, plaintiffs had the burden to prove that exposure to asbestos-containing materials *at Rossmoor* was a substantial factor in contributing to the risk of Marline's mesothelioma. Because Joseph's and Marline's testimony did not show that Joseph's clothing was contaminated with asbestos fibers at the times Joseph was in contact with Marline, plaintiffs did not establish that asbestos from Rossmoor was a substantial factor in causing Marline's mesothelioma. Therefore, nonsuit relating to secondary exposure was correctly granted.

4.     *Nonsuit for direct exposure*

Plaintiffs also argue that nonsuit for Rossmoor should be reversed because even though Marline was never on the Rossmoor premises while construction was occurring, she

nevertheless may have been exposed to asbestos there. They do not dispute that there was no visible dust when Marline visited the Rossmoor construction site, but contend that "the fact that you do not see dust does not mean that you are not being exposed." Plaintiffs point to Dr. Roggli's testimony that asbestos fibers are invisible when they are suspended in the air and separated from one another. Plaintiffs also argue that asbestos fibers "can remain in the air for 15 minutes or more" once disturbed.

There are two problems with plaintiffs' argument. First, the cited evidence does not support it. Plaintiffs cite Hatfield's testimony in which he discussed testing of "exposures generated from a particular activity." He testified that "most of these activities did take place for – in the range of 10, 15 minutes, which people do label as peak exposures." Hatfield did not testify that invisible asbestos fibers remain airborne for 15 minutes after activity has ceased.

Second, even assuming Hatfield's testimony supported plaintiffs' statement, plaintiffs do not point to any evidence that Joseph and Marline visited construction sites within 15 minutes of asbestos dust-producing construction work. Plaintiffs also have not pointed to any evidence indicating that asbestos fibers would have become airborne and respirable as Joseph and Marline walked around the site. As we noted above, mere presence at a location where asbestos is present is insufficient to establish exposure. Indulging every legitimate inference that may be drawn from the evidence in plaintiffs' favor, there was insufficient evidence to support a jury verdict for plaintiffs. (See *Hernandez v. Amcord, Inc., supra,* 215 Cal.App.4th at p. 669.)

The trial court therefore did not err in granting nonsuit to Rossmoor on plaintiffs' direct exposure claims.

**B.    Ford**

Plaintiffs assert two errors relating to Ford.  First, they argue the trial court erred in instructing the jury that Ford could not be held liable for asbestos exposure from vehicle parts not originally installed by Ford.  Second, plaintiffs argue that if we reverse the judgment as to Ford, we also should reverse the court's summary adjudication of plaintiffs' punitive damages claims against Ford.  We address each of these arguments below.

1.    *Jury instructions at trial*

When discussing jury instructions, the court said CACI Nos. 430 and 435 should be given.  CACI No. 430, relating to the substantial factor test, states, "A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm.  It must be more than a remote or trivial factor.  It does not have to be the only cause of the harm."  The use notes for CACI No. 430 say, "In asbestos-related cancer cases, *Rutherford v. Owens-Illinois, Inc.*[, *supra*,] 16 Cal.4th [at p.] 977 [67 Cal.Rptr.2d 16, 941 P.2d 1203] requires a different instruction regarding exposure to a particular product. Give CACI No. 435, Causation for Asbestos-Related Cancer Claims, and do not give this instruction."

CACI No. 435 states, "A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm.  It does not have to be the only cause of the harm.  [¶]  [Name of plaintiff] may prove that exposure to asbestos from [name of defendant]'s product was a substantial factor causing [his/her/[name of decedent]'s] illness by showing, through expert testimony, that there is a reasonable medical

40

probability that the exposure was a substantial factor contributing to [his/her] risk of developing cancer." The use notes for CACI No. 435 state, "Unless there are other defendants who are not asbestos manufacturers or suppliers, do not give CACI No. 430, Causation: Substantial Factor."

Plaintiffs' counsel argued, "[F]or the record, . . . I don't think 430 ought to be given," but suggested that the issue already had been discussed off the record. Exxon's counsel argued that because Exxon was a premises liability defendant with no products claims pending against it, CACI No. 430 was the appropriate instruction: "[C]ounsel has cited no authority that would extend 435, which is specifically for manufacturers and suppliers of asbestos-containing products, to a premises defendant." Over Exxon's objection, the court agreed to give CACI No. 435 as to Exxon.

The court's instructions to the jury included the following: "[430.] A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It must be more than a remote or trivial factor. It does not have to be the only cause of the harm. [¶] . . . . [¶] 435. A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It does not have to be the only cause of the harm. Plaintiff Marline Petitpas must prove that exposure to asbestos from Exxon Mobil Corporation or Ford Motor Company was a substantial factor causing her illness by showing through expert testimony there is a reasonable medical probability that the exposure was a substantial factor contributing to her risk of developing mesothelioma."

41

The court also gave Ford's Special Instruction No. 2: "Ford Motor Company is not liable for Marline Petitpas' exposure to asbestos that comes from other companies' brakes, clutches or gasket products installed on Ford vehicles by parties other than Ford." This instruction was based on *O'Neil, supra,* 53 Cal.4th at p. 342, in which the court held that "a product manufacturer may not be held liable in strict liability or negligence for harm caused by another manufacturer's product unless the defendant's own product contributed substantially to the harm, or the defendant participated substantially in creating a harmful combined use of the products."

Plaintiffs filed a written objection to this instruction, arguing that *O'Neil* applies to failure-to-warn allegations only. After the court read the instruction, while the jury was out of the courtroom, plaintiffs' counsel stated again, "[W]e object to that special instruction at all for the reasons that we previously stated." Plaintiffs argued that the design of Ford cars was defective because "it is a Ford design that called for the installation and inclusion of asbestos-containing brake products whether or not they were made by Ford or anyone else." Ford disagreed that plaintiffs' argument correctly reflected the law.

In closing arguments, plaintiffs' counsel told the jury to focus on the definition of substantial factor in the jury instructions. Counsel then read part of CACI No. 430: "'A substantial factor in causing harm . . . is a factor that a reasonable person would consider to have contributed to harm.' That's it." Shortly thereafter, plaintiffs' counsel also read a portion of CACI No. 435 to the jury. Plaintiffs' counsel read question 8 on the verdict form, which asked whether Marline's "exposure to asbestos dust from Ford original equipment brakes,

42

gaskets, or clutches [was] a substantial factor in contributing to her risk of developing meosthelioma." Counsel argued, "[E]ven if the original lining had been changed out, [it is] still a Ford drum and assembly with the backing plate that's holding all the dust." Plaintiffs' counsel focused on the evidence presented, arguing that it supported a finding for plaintiffs. Counsel read CACI Nos. 430 and 435 to the jury again in rebuttal arguments.

In its closing, counsel for Exxon also discussed CACI Nos. 430 and 435. Counsel for Ford argued that the evidence did not support a finding that Marline was present at the Enco station when Joseph was working on any Ford cars. Counsel also referred to Special Instruction No. 2, stating that Ford could not be held liable for other parties' products. "[T]he law says basically that if the exposure that she had, whatever it might have been, was not a Ford brake, clutch or gasket installed on a Ford vehicle by Ford, that's not our responsibility." Counsel also emphasized that the defense epidemiologists made clear that the available studies and literature showed that brake mechanics had no increased risk of mesothelioma.

As discussed above, the jury found that Marline was exposed to asbestos from Ford original brakes, gaskets, or clutches, but that the exposure was not a substantial factor in contributing to her risk of mesothelioma.

2. *Plaintiffs' contentions on appeal*

Plaintiffs assert that Special Instruction No. 2, stating that Ford was not liable for parts that were not originally installed by Ford, was incorrect. Plaintiffs argue that by giving this instruction and also giving CACI No. 430, the trial court incorrectly limited the jury's consideration of asbestos exposure resulting from design defects. We review the legal adequacy of

43

jury instructions de novo. (*Davis v. Honeywell International Inc.* (2016) 245 Cal.App.4th 477, 495.)

Plaintiffs argue that because Ford cars were designed with braking systems intended to be used with asbestos brake linings, Ford is liable for any injuries caused by Marline's exposure to asbestos replacement parts.[14] Ford, on the other hand, contends that under *O'Neil, supra*, 53 Cal.4th 335, a manufacturer is not liable for exposure to asbestos from replacement parts that were not manufactured or supplied by Ford.

Plaintiffs' theory is not supported by the law or the evidence in this case. In *O'Neil*, the decedent was exposed to asbestos on a naval ship from insulation, gaskets, and packing used in conjunction with pumps and valves manufactured by the defendants. (*O'Neil, supra*, 53 Cal.4th at p. 342.) The Navy replaced all of the original asbestos-containing parts before the decedent was exposed to them, and the manufacturers of the pumps and valves were not part of the chain of distribution for those replacement parts. (*Ibid*.) The Supreme Court held that the manufacturers of the pumps and valves could not be liable for the decedent's exposure: "[A] product manufacturer may not be held liable in strict liability or negligence for harm caused by another manufacturer's product unless the defendant's own product contributed substantially to the harm, or the defendant participated substantially in creating a harmful combined use of the products." (*O'Neil, supra*, 53 Cal.4th at p. 342.)

---

[14] Although the instruction and verdict form referenced brakes, clutches, and gasket products, plaintiffs' argument on appeal discusses replacement brakes only, and includes record citations to evidence relating to brake parts. We therefore focus our analysis on brake parts.

44

The plaintiffs in *O'Neil* argued that the "defendants' products were defective because they were 'designed to be used' with asbestos-containing components." (*O'Neil*, *supra*, 53 Cal.4th at p. 350.) The Supreme Court rejected this argument. It noted that "strict products liability in California has always been premised on harm caused by deficiencies in the defendant's own product." (*Id*. at p. 348.) The court added, "It is fundamental that the imposition of liability requires a showing that the plaintiff's injuries were caused by an act of the defendant or an instrumentality under the defendant's control." (*Id*. at p. 349.)

Plaintiffs point to *O'Neil*'s footnote 6: "A stronger argument for liability might be made in the case of a product that *required* the use of a defective part in order to operate. In such a case, the finished product would inevitably incorporate a defect." ( *O'Neil, supra*, 53 Cal.4th at p. 350 fn. 6.) As the Court in *O'Neil* pointed out, at the time the warship in that case was built, "asbestos was the only insulating material that could withstand the extremely high temperatures and pressures produced by a warship's steam propulsion system. Following mandated Navy specifications, Crane used asbestos in its valves and packing. However, no evidence was presented that asbestos, as opposed to some other type of insulation material, was needed in order for the valves to function properly." (*Id*. at p. 344.) For the other defendant, Warren, "no evidence was presented that Warren's pumps required the use of internal components made with asbestos in order to operate." (*Ibid*.) This did not amount to a design defect because "[a]s alternative insulating materials became available, the Navy could have chosen to replace worn gaskets and seals in defendants' products with parts that did not contain asbestos. Apart from the Navy's specifications, no

45

evidence showed that the design of defendants' products required the use of asbestos components, and their mere compatibility for use with such components is not enough to render them defective." (*Id.* at p. 350.)

Division Five of the First Appellate District recently followed this reasoning in *Johnson v. ArvinMeritor* (2017) 9 Cal.App.5th 234. In that case, the plaintiff alleged he had been exposed to asbestos-containing parts in axle and brake assemblies. (*Id.* at p. 237.) The plaintiff alleged that defendant ArvinMeritor was liable under a design defect theory because defendant's brake assemblies required the use of asbestos-containing brake linings, even if ArvinMentor did not supply those brake linings. (*Id.* at pp. 245-246.) The court compared the facts with *O'Neil*, and held that there was no liability for design defect: "As with the pumps and valves in *O'Neil*, the Rockwell axle and brake assemblies, as originally manufactured, incorporated asbestos-containing material (brake linings) supplied by a third party (Carlisle), and asbestos-containing replacement parts, whether made by Carlisle or others, were most likely used in aftermarket repairs. But nothing demonstrates that the assemblies were themselves defective, apart from the hazards presented by the third party components." (*Id.* at p. 247.)

The plaintiff in *Johnson* also pointed to footnote 6 in *O'Neil*, and argued that the "brake assemblies specified and required use of asbestos-containing brake linings." (*Johnson, supra*, 9 Cal.App.5th at p. 247.) The court rejected this argument: "As with the products in *O'Neil*, there is no evidence that the brake assemblies required asbestos-containing materials in order to function generally. (See *O'Neil, supra*, 53 Cal.4th at p. 343.)

46

There is no evidence that any alternatives to asbestos-containing friction materials were even available for automotive use at the relevant times. There is no evidence that, as alternative friction materials became available, users of Rockwell's brake assemblies could not have chosen to replace the brake linings with parts that did not contain asbestos. In fact, the record suggests that, as vehicle manufacturers transitioned from use of asbestos-containing friction materials, this is exactly what occurred. There is no evidence Rockwell needed to redesign its brake assemblies to accommodate asbestos-free linings." (*Id.* at p. 248.) The court found that the plaintiff's argument would constitute an "unprecedented" extension of liability: "Were we to accept Johnson's argument, by logical extension every vehicle produced by any manufacturer during the period before nonasbestos friction materials became generally available would be considered a defective product simply by virtue of incorporation of, or specification of, asbestos-containing materials in third party component parts." (*Ibid.*)

The same reasoning applies here. Plaintiffs did not present any evidence to show that cars originally equipped with asbestos-containing brakes were unable to use non-asbestos brake parts. No evidence suggested that Ford-designed brake drums or disks were incompatible with lining materials that did not contain asbestos. Although the evidence indicated that in the 1960's and much of the 1970's replaceable brake linings almost universally contained asbestos, and therefore the available replacement brake linings contained asbestos, mere compatibility with such parts does not render a product defective. Other than presenting evidence that replacement brake linings typically contained asbestos at the time, plaintiffs presented no evidence that the

47

very design of Ford cars from that time period *required* brakes that contained asbestos. Plaintiffs therefore have not demonstrated that Ford's design falls outside the scope of *O'Neil*'s central holding that a manufacturer cannot be held liable for harm caused by another manufacturer's product.

In plaintiffs' reply brief, they cite to *O'Neil*'s duty-to-warn analysis to support their contention that Ford cars were defectively designed because they incorporated asbestos-containing brake parts. However, a duty to warn is not relevant to the design defect analysis here. California recognizes three different types of product defects under strict liability—manufacturing defects, design defects, and warning defects. (*Anderson v. Owens-Corning Fiberglas Corp.* (1991) 53 Cal.3d 987, 995.) "[A] product is defective in design either (1) if the product has failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, or (2) if . . . the benefits of the challenged design do not outweigh the risk of danger inherent in such design." (*Barker v. Lull Engineering Co.* (1978) 20 Cal.3d 413, 418.) Strict liability for failure to warn, on the other hand, "require[s] a plaintiff to prove . . . that the defendant did not adequately warn of a particular risk that was known or knowable in light of the generally recognized and prevailing best scientific and medical knowledge available at the time of manufacture and distribution." (*Anderson*, 53 Cal.3d at p. 1002.) Therefore, "[t]he 'warning defect' relates to a failure extraneous to the product itself." (*Ibid*.) The legal analysis for these types of product defects is not interchangeable, and plaintiffs offer no argument or

48

reasoning supporting the application of a failure-to-warn analysis to support a finding of design defect.[15]

Moreover, even if *O'Neil*'s failure-to-warn analysis were applicable here, it does not support plaintiffs' argument. In the portion of its decision addressing a duty to warn, the *O'Neil* Court explained that the manufacturer of a product intended to be used with asbestos-containing parts may have a duty to warn about potential asbestos-related hazards where "the defendant's product was intended to be used with another product for the very activity that created a hazardous situation." (*O'Neil, supra*, 53 Cal.4th at p. 361.) The court distinguished *Tellez-Cordova v. Campbell-Hausfeld/Scott Fetzger Co.* (2004) 129 Cal.App.4th 577 (*Tellez-Cordova*), in which the plaintiff alleged that he worked extensively with tools designed to grind and sand metals, thus producing respirable metallic dust that caused him to develop pulmonary fibrosis. In reversing an order of dismissal based on the sustaining of a demurrer, the Court of Appeal held that the plaintiff had alleged a viable cause of action under a duty-to-warn theory. (*Ibid*.)

The *O'Neil* Court distinguished *Tellez-Cordova* from the case before it in two ways. First, the Court noted that according to the complaint, "the power tools in *Tellez-Cordova* could only be

_____

[15] Plaintiffs argued below that *O'Neil* "does not apply with respect to design defect liability." This is incorrect; the *O'Neil* Court expressly addressed that theory, holding that design defect liability was not available under the circumstances: "We conclude that defendants were not strictly liable for O'Neil's injuries because (a) any design defect in *defendants' products* was not a legal cause of injury to O'Neil, and (b) defendants had no duty to warn of risks arising from *other manufacturers'* products." (*O'Neil, supra*, 53 Cal.4th at p. 348.)

used in a potentially injury-producing manner.  Their sole purpose was to grind metals in a process that inevitably produced harmful dust.  In contrast, the normal operation of defendants' pumps and valves did not inevitably cause the release of asbestos dust.  This is true even if 'normal operation' is defined broadly to include the dusty activities of routine repair and maintenance, because the evidence did not establish that defendants' products needed asbestos-containing components or insulation to function properly." (*O'Neil, supra*, 53 Cal.4th at p. 361.)  Second, the Court reasoned that "it was the action of the power tools in *Tellez-Cordova* that caused the release of harmful dust, even though the dust itself emanated from another substance. . . .  The same is not true here.  The asbestos dust that injured O'Neil came from thermal insulation and replacement gaskets and packing made by other manufacturers.  Nothing about defendants' pumps and valves caused or contributed to the release of this dust." (*Ibid*.)  The *O'Neil* Court continued, "Recognizing a duty to warn was appropriate in *Tellez–Cordova* because there the defendant's product was intended to be used with another product *for the very activity that created a hazardous situation*." (*Ibid*.)  The same analysis was not applicable for valves and pumps that included asbestos-containing gaskets and insulation, the Court said, because "where the hazard arises entirely from another product, and the defendant's product does not create or contribute to that hazard, liability is not appropriate." (*Id*. at pp. 361-362.)

Several cases have followed *Tellez-Cordova* in finding that liability may arise from the use of brake lining arcing machines.  As Joseph and Marline testified in this case, the work of arcing brake linings can create airborne dust.  In cases specific to arcing

50

machines, as in *Tellez-Cordova*, plaintiffs alleged that the arcing machine's sole purpose was to grind brake linings, at the relevant time all brake linings contained asbestos, and grinding the brake linings on the machine created hazardous airborne dust. Courts have found that the arcing machines therefore were "intended to be used with another product *for the very activity that created a hazardous situation*." (*Bettencourt v. Hennessy Industries, Inc.* (2012) 205 Cal.App.4th 1103, 1116 [partially reversing judgment on the pleadings]; see also *Shields v. Hennessy Industries, Inc.* (2012) 205 Cal.App.4th 782, 797 [reversing judgment on the pleadings]; *Sherman v. Hennessy Industries, Inc.* (2015) 237 Cal.App.4th 1133, 1147 [reversing summary judgment]; *Hetzel v. Hennessy Industries, Inc.* (2016) 247 Cal.App.4th 521, 525 [reversing summary judgment]; *Rondon v. Hennessy Industries, Inc.* (2016) 247 Cal.App.4th 1367, 1381 [reversing summary judgment].)

This case is more like *O'Neil* than *Tellez-Cordova* and the arcing machine cases. A car is not like a brake lining arcing machine, in which the intended use of the machine is the very activity that creates a hazardous situation—respirable airborne dust. There was no evidence presented that using a car's brakes created airborne dust that exposed the user to respirable asbestos fibers. To the contrary, the testimony indicated that brake dust collected in the brake drum, rather than being released into the air. And even if we were to define the "normal operation" of a vehicle to include routine repair and maintenance, as the Court did in *O'Neil*, liability still would not attach. Only the manner in which Joseph or others chose to clean the brake drums—by blowing the dust out with compressed air or tapping the dust out onto the ground—released the dust into the air. Had Joseph or

others chosen to clean brake drums in some other manner, such as vacuuming brake dust out of the drums or wiping the drums with wet rags, presumably the existence of airborne dust would have been minimized. This implicates a critical issue in product liability jurisprudence: "It is fundamental that the imposition of liability requires a showing that the plaintiff's injuries were caused by an act of the defendant or an instrumentality under the defendant's control." (*O'Neil*, *supra*, 53 Cal.4th at p. 349.) Plaintiffs did not present evidence that Ford's design left no other option than to blow brake dust into the air, and the manner in which Joseph and others at the Enco station chose to clean brake drums was not under Ford's control.[16]

We therefore decline to find an exception to *O'Neil* in this case. That Ford vehicles were compatible with other manufacturers' asbestos-containing brakes available at the time did not make Ford liable under a design defect theory of liability for Marline's exposure to asbestos from replacement brakes placed into the stream of commerce by other manufacturers. Special Instruction No. 2 correctly stated the law under *O'Neil*.

### 3. *CACI No. 430 regarding causation*

Plaintiffs argue that the *O'Neil* instruction error in Ford's Special Instruction No. 2 "was exacerbated when the court read CACI 430 to the jury" because it imposed a higher burden on plaintiffs. CACI No. 430, as given, stated, "A substantial factor in causing harm is a factor that a reasonable person would

---

[16] Plaintiffs presented evidence that Ford knew that cleaning brake dust from brake drums with compressed air could cause the release of respirable asbestos fibers. While such evidence might have been relevant to a duty to warn, which plaintiffs do not assert here, without more it was not relevant to the design defect claim plaintiffs assert.

consider to have contributed to the harm. It must be more than a remote or trivial factor. It does not have to be the only cause of the harm."

Plaintiffs argue that the inclusion of CACI No. 430 exacerbated the error of giving Ford's Special Instruction No. 2. As explained above, however, we find that Special Instruction No. 2 was correct. The use of CACI No. 430 therefore could not have exacerbated any such error.

Plaintiffs also argue that the directions for use for CACI No. 430 state that it should not be given in asbestos cases. Plaintiffs argue that the instruction required plaintiffs to show that defendants' conduct contributed to *the harm*, rather than contributed to *the risk of harm*, as stated in CACI No. 435, the causation instruction specific to asbestos-related cancer claims. Plaintiffs argue that the instructions likely confused the jury and imposed a higher burden of proof on plaintiffs.[17]

Ford points out that CACI No. 430 was requested by Exxon, which was a premises liability defendant and not a product liability defendant. Ford also argues that directions for use of CACI No. 435 state, "Unless there are other defendants who are not asbestos manufacturers or suppliers, do not give CACI No. 430, Causation: Substantial Factor." Here, Ford argues, Exxon was not an asbestos manufacturer or supplier, and therefore the inclusion of CACI No. 430 was appropriate.

---

[17] Ford argues that plaintiffs forfeited this argument by suggesting to the trial court that both instructions should be read to the jury. However, this occurred only after plaintiffs' counsel already objected to the inclusion of CACI No. 430, however. Plaintiffs' objection therefore was preserved.

Causation specific to asbestos cases was discussed in *Rutherford, supra,* 16 Cal.4th 953. In that case, the Supreme Court acknowledged that an asbestos plaintiff could not be expected to connect a particular defendant's asbestos fibers to the origins of the plaintiff's cancer. The Court therefore held that "plaintiffs may prove causation in asbestos-related cancer cases by demonstrating that the plaintiff's exposure to defendant's asbestos-containing product in reasonable medical probability was a substantial factor in contributing to the aggregate dose of asbestos the plaintiff or decedent inhaled or ingested, and hence to the *risk* of developing asbestos-related cancer, without the need to demonstrate that fibers from the defendant's particular product were the ones, or among the ones, that *actually* produced the malignant growth." (*Id.* at pp. 976-977, footnote omitted.) The Court held that the jury should be instructed that a plaintiff's exposure to asbestos is a substantial factor "in causing or bringing about the disease if in reasonable medical probability it was a substantial factor contributing to plaintiff's or decedent's *risk* of developing cancer." (*Id.* at p. 977.) The Court reiterated its holding and pointed to related instructions, stating, "[T]he plaintiff may meet the burden of proving that exposure to defendant's product was a substantial factor causing the illness by showing that in reasonable medical probability it was a substantial factor contributing to the plaintiff's or decedent's risk of developing cancer. The jury should be so instructed. *The standard instructions on substantial factor and concurrent causation* (BAJI Nos. 3.76 and 3.77) *remain correct in this context and should also be given.*" (*Rutherford, supra,* 16 Cal.4th at pp. 982-983, italics added.)

In the time since *Rutherford* was decided in 1997, CACI instructions have been implemented, including CACI No. 435, specific to asbestos causation.  The directions for use for CACI No. 430 now state, "In asbestos-related cancer cases, *Rutherford* [*supra*] requires a different instruction regarding exposure to a particular product. Give CACI No. 435, Causation for Asbestos-Related Cancer Claims, and do not give this instruction." (CACI No. 430, directions for use.)  The directions for use in CACI No. 435 say, "Unless there are other defendants who are not asbestos manufacturers or suppliers, do not give CACI No. 430, Causation: Substantial Factor."  It appears, therefore, that despite *Rutherford*'s statement that the standard instruction on substantial factor remains correct and also should be given, the CACI use notes disagree with this approach.

Other than the Use Notes, plaintiffs have presented us with no authority supporting their argument that CACI No. 430 should not be given in an asbestos case that includes a defendant that is not a manufacturer or supplier.  "Pattern jury instructions . . . while designed to accurately reflect the law, are not the law itself." (*Christian Research Institute v. Alnor* (2007) 148 Cal.App.4th 71, 82, citing *People v. Alvarez* (1996) 14 Cal.4th 155, 217.)  That the Use Notes caution against giving the more general CACI No. 430 in a mesothelioma case, when the more specific instruction CACI No. 435 is more applicable, does not support a conclusion that it was error to give both instructions. CACI No. 430 is a correct statement of the law relating to substantial factor causation, even though, as *Rutherford* noted, more specific instructions *also* must be given in a mesothelioma case.  Because the more specific CACI No. 435 also was given, we do not find that the trial court erred by giving both instructions.

Even if giving both CACI Nos. 430 and 435 was error, it was harmless. "A judgment may not be reversed on appeal, even for error involving 'misdirection of the jury,' unless 'after an examination of the entire cause, including the evidence,' it appears the error caused a 'miscarriage of justice.' (Cal. Const., art. VI, § 13.)" (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574.) "In assessing prejudice from an erroneous instruction, we consider, insofar as relevant, '(1) the degree of conflict in the evidence on critical issues [citations]; (2) whether respondent's argument to the jury may have contributed to the instruction's misleading effect [citation]; (3) whether the jury requested a rereading of the erroneous instruction [citation] or of related evidence [citation]; (4) the closeness of the jury's verdict [citation]; and (5) the effect of other instructions in remedying the error [citations].' [Citations.]" (*Id.* at pp. 570-571.)

Here, there was not a large degree of conflict about general causation. Experts from both sides agreed that there is a certain amount of "ambient" or "background" asbestos in the air, and excessive exposure to asbestos can cause disease. There was some conflict in the evidence about the extent to which brake dust might contribute to a risk of developing mesothelioma. Plaintiffs presented evidence that cleaning brake drums with compressed air created airborne asbestos levels that exceeded OSHA requirements; defendants presented evidence that brake dust was largely harmless forsterite and auto workers did not experience an increased risk of asbestos-related disease. No evidence was presented to show that bystanders near automotive workers had an increased risk of disease.

As for specific causation, there was no dispute about Marline's presence at the Enco station, and no dispute that about

56

40 percent of the cars serviced at the Enco station were Ford vehicles. The experts' opinions differed regarding whether the alleged exposures contributed to Marline's risk of developing mesothelioma. Therefore, there were conflicts in the evidence as to whether exposure to Ford's asbestos-containing auto parts at the Enco station could have been a substantial factor in causing Marline's mesothelioma.

It does not appear that defendants' arguments contributed to any misleading effect of CACI No. 430. Before defense counsel talked about CACI No. 430 in closing arguments, plaintiffs' counsel stated, "A substantial factor in causing harm . . . is a factor that a reasonable person would consider to have contributed to harm. That's it. Do you believe that it contributed to the harm? . . . . That's the question." This language is in both CACI Nos. 430 and 435. Plaintiffs' counsel also read CACI No. 435, and said plaintiffs, through the testimony of Dr. Horn, had met their burden to prove that Marline's combined exposures to asbestos constituted a substantial factor contributing to her risk of mesothelioma.

Counsel for Ford, the defendant to whom plaintiffs' appellate argument is directed, did not address CACI Nos. 430 and 435 in closing arguments. Counsel for Exxon noted that CACI No. 430 states that a substantial factor "must be more than a remote or trivial factor," and noted that Dr. Dyson testified that Marline's exposures were trivial. Exxon's counsel then discussed CACI No. 435, and argued that the epidemiological studies demonstrated no increased risk in auto industry workers.

Plaintiffs argue that Exxon's comments were prejudicial because the Judicial Council Advisory Committee on Civil Jury Instructions "expressly and specifically found that the 'trivial'

57

language from CACI 430 should not be given in an asbestos case." In fact, the Advisory Committee considered whether an instruction about "trivial" exposures *must* be given or could be omitted, and ultimately decided that "the issue is appropriate for legal argument, to be decided by the trial judge." (Report of the Advisory Committee on Civil Jury Instructions, Oct. 12, 2007, p. 6, available at www.courts.ca.gov/documents/120707item4.pdf.) The Advisory Committee noted *Rutherford*'s statement that "a force [that] plays only an "infinitesimal" or "theoretical" part in bringing about injury, damage, or loss is not a substantial factor." (*Id*. at p. 5, quoting *Rutherford, supra*, 16 Cal.4th at p. 969.) The Committee continued, "While under *Rutherford* there clearly is a de minimis standard at which there is no liability, it does not follow that the jury must be so instructed. The committee believes that neither *Rutherford* nor any other case or legal principle requires that the jury be instructed on a limitation based on 'infinitesimal,' 'theoretical,' 'negligible,' or 'trivial' contribution to the aggregate dose." (*Ibid*.) The report noted that the committee was divided on the issue, and said that until further legal guidance was provided, the question should be determined on a case-by-case basis. (*Id*. at pp. 5-6.) Contrary to plaintiffs' argument, therefore, the Advisory Committee did not conclude that a "trivial" instruction is inherently inappropriate in an asbestos case. We do not find Exxon's fleeting mention of trivial exposures to be misleading.

The third factor relating to prejudice is whether the jury requested a rereading of an erroneous instruction or related evidence. Here, the jury did not request such information. The fourth factor is the closeness of the jury's verdict. Here, on the

58

substantial factor question relating to Ford, the jury found in favor of Ford ten to two.

The fifth factor is the effect of other instructions in remedying the error. Here, even if CACI No. 430 is insufficiently detailed to accurately reflect substantial factor causation in an asbestos case, the court also read CACI No. 435, which is specific to asbestos cases. The question on the verdict form correctly stated the substantial factor standard, asking whether Marline's exposure was "a substantial factor in contributing to her risk of developing mesothelioma." Counsel on both sides argued both jury instructions. The jury found that Marline's exposure to asbestos at the Enco station was a substantial factor in contributing to the risk of her disease but exposure to Ford parts was not. Plaintiff argues that this indicates that the jury must have been confused, but to the contrary, it shows that the jury understood it was not constrained as to any predetermined answer to the substantial factor question.

Plaintiffs have not shown that the inclusion of CACI No. 430 was erroneous, nor that they were prejudiced by the use of CACI No. 430.

4. *Ford's motion for summary adjudication of plaintiffs' punitive damages claim*

Ford moved for summary adjudication of plaintiffs' punitive damages claims before trial. The court granted the motion, stating, "[T]here is not a showing of factual issues of conscious disregard towards a bystander or a showing that there was a duty owed to her relative to the – that they had a conscious disregard toward a bystander that would justify punitives."

On appeal, plaintiffs' arguments as to Ford's motion are relevant only if we were to find a basis for reversing the verdict

59

in favor of Ford.  Plaintiffs state in their opening brief, "Assuming that the judgment in Ford's favor is reversed, reversal of the summary adjudication is also required so that plaintiffs can seek recovery of punitive damages at retrial."  In their reply, they state, "Upon reversal, the trial court must be directed to reverse its grant of summary adjudication as to the punitive damage issues."

As stated above, we find no basis to reverse the verdict as to Ford.  Plaintiffs' arguments as to Ford's motion for summary adjudication are therefore moot.

## C.   Verdict in favor of Exxon

The jury returned a verdict in favor of Exxon.  Plaintiffs argue that the evidence did not support the verdict.

When the trier of fact has expressly or implicitly concluded that the party with the burden of proof failed to carry that burden and that party appeals, the substantial evidence test does not apply.  Instead, "the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law." (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 279.)  "'Specifically, the question becomes whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." [Citations.]'" (*In re R.V.* (2015) 61 Cal.4th 181, 218.)  Plaintiffs correctly recognize this standard of review, and argue that the evidence at trial compelled a finding in their favor against Exxon as a matter of law.

Here, the jury found that Exxon controlled the Enco station, that Marline was exposed to asbestos there, and that Marline's exposure at the Enco station was a substantial factor in

contributing to her risk of developing mesothelioma.  However, when asked if "Exxon [knew], or through the exercise of reasonable care should have known, that there was a condition at the Enco station that created an unreasonable risk to Mrs. Petitpas of exposure to asbestos dust," the jury unanimously answered "no."  Plaintiffs argue that this answer "is not legally supportable in light of the uncontradicted evidence that Exxon *actually* knew about the danger."

The evidence presented at trial arguably shows that Exxon knew about potential dangers of asbestos exposure to refinery workers—not bystanders at service stations.  The evidence does not support a finding, as a matter of law, that Exxon knew that there was a condition at the Enco station that created an unreasonable risk to Marline.

Plaintiffs argue that Exxon "not only knew about the general risks associated with asbestos exposure, but knew about the risks associated with asbestos released from [the] inspection and repair of brakes," and "Exxon had *actual knowledge* that terminal disease was associated with exposure of automotive mechanics to work on asbestos-containing brakes."  The cited evidence does not support these statements.  Plaintiffs point to the testimony of their expert, Dr. Weaver, who was formerly employed as a physician addressing issues of worker health at oil refineries for Exxon predecessors.  Before Dr. Weaver's testimony was read to the jury, the court gave a limiting instruction:  "Dr. Weaver was appearing at this deposition as an expert witness, not as a corporate representative of Exxon Mobil corporation.  [¶] None of the products identified in this deposition are brakes, gaskets, or clutches; none of the locations identified are service stations.  The only locations are refineries."  Dr. Weaver's

61

testimony addressed working conditions at refineries and generally available knowledge that asbestos can cause disease, but he said nothing about knowledge of hazards involving brake or automotive work. Dr. Weaver's testimony therefore does not support a finding that Exxon knew or should have known that bystanders at service stations might be at risk for hazardous asbestos exposure.

Plaintiffs also cite the testimony of their expert, Dr. Castleman, who testified that the health hazards relating to the inhalation of asbestos dust was known by 1929. However, he also acknowledged that much of the asbestos-related research through the 1940's and 1950's was "being done in factories that worked directly with asbestos." Dr. Castleman also testified that a Dr. Wilhelm Hueper published data in 1965 relating to health hazards of brakes and "brake work." Dr. Castleman testified that Dr. Hueper did not rely on any epidemiological studies, but rather was "drawing a broad picture of public health hazard from asbestos use in society." Dr. Castleman testified that internal communications at the Friction Materials Standards Institute—which included companies that made asbestos brakes, such as Bendix—"appeared to talk about asbestos starting in 1968."[18] Dr. Castleman did not testify about Exxon's knowledge regarding whether automotive workers were exposed to asbestos.

Plaintiffs argue that under agency theory, knowledge can be imputed from a principal to an agent. Plaintiffs contend that because the principal—Exxon management—knew about the hazards of asbestos exposure to refinery workers, we may assume

---

[18] Since there was no evidence suggesting that Marline visited Joseph at any Enco stations after 1968, Exxon's knowledge on that point after 1968 is irrelevant.

that agents—subsidiary service stations—also knew. Plaintiffs also assert that "Exxon presented no evidence at all demonstrating that its refineries were operated independently of its retail service stations." This theory is not well taken.

As noted above, the trial court correctly granted summary adjudication of plaintiffs' product liability claims against Exxon. Plaintiffs therefore proceeded to trial against Exxon on premises liability claims. The jury was asked whether Exxon knew or should have known "that there was a condition *at the Enco station* that created an unreasonable risk" to Marline (italics added). Evidence suggesting there were conditions at other locations (refineries) that posed a risk to a different class of people (refinery workers), without more, cannot support an affirmative answer to the question posed to the jury.

Moreover, even if the evidence plaintiffs rely upon supported their argument, it would not compel reversal. As discussed above, reversal under these circumstances requires "uncontradicted and unimpeached" evidence that is "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." Here, however, the evidence was contradicted. As noted above, several witnesses testified that brake dust was almost exclusively non-hazardous forsterite, not asbestos. Defense expert Dr. Roggli testified that forsterite "has no disease-producing potential at all." Dr. Castleman testified that by 1969, "there was nothing in print on the measurement of exposure of brake mechanics to asbestos." Counsel for Exxon read to the jury a portion of Dr. Castleman's deposition testimony in which Dr. Castleman stated that to this day, there are no studies "that have any statistical power . . . that speak of the mesothelioma risk of mechanics that

63

do brake repair work." Plaintiffs' expert Dr. Barry Horn also testified that several studies found no increased risk of mesothelioma in auto mechanics. There was no evidence linking asbestos exposure to occasional bystanders who were near automotive workers as they did brake work.

Contrary to plaintiffs' arguments, therefore, Exxon's knowledge about asbestos hazards for vehicle mechanics—and bystanders at service stations—was far from uncontroverted. Plaintiffs have not met the high threshold of showing that they were entitled to a verdict against Exxon as a matter of law.

## DISPOSITION

The judgment is affirmed. Defendants are entitled to costs on appeal.

## CERTIFIED FOR PUBLICATION

COLLINS, J.

We concur:

EPSTEIN, P. J.

WILLHITE, J.