Filed 3/16/23  P. v. Sult CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JAMES EDWARD SULT,<br><br>    Defendant and Appellant. | B316176<br><br>(Los Angeles County Super. Ct. No. A527551) |

APPEAL from an order of the Superior Court of Los Angeles County, Rob B. Villeza, Judge.  Reversed.

Jonathan E. Demson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, and Idan Ivri, Marc A. Kohm, and Nikhil Cooper, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant James Edward Sult (defendant) pled guilty to the second degree murder of Michael Lambdin (Lambdin) in 1982. Nearly 40 years later, defendant petitioned for resentencing under Penal Code section 1172.6 (former Penal Code section 1170.95).[1] Relying on the transcript of defendant's preliminary hearing, the trial court denied the petition based on its finding that the prosecution had proven beyond a reasonable doubt that defendant was a major participant in the underlying felony who acted with reckless indifference to human life. We consider whether substantial evidence supports this finding, focusing on the reckless indifference element.

## I. BACKGROUND

Defendant and co-defendants Ronald St. Pierre (St. Pierre), Fernando Zamora (Zamora), and Abel Salgado (Salgado) were charged with murder and assault with a deadly weapon in 1981. Salgado fatally stabbed victim Lambdin, and defendant was charged on an aiding and abetting theory of liability. In 1982, after the prosecution presented its case-in-chief at trial, defendant opted to plead guilty to second degree murder. The trial court sentenced him to 15 years to life in state prison.

Defendant filed a petition for resentencing under section 1172.6 in 2019. The original sentencing judge had retired by then. The matter was assigned to another trial court and that court summarily denied defendant's petition because it believed, wrongly, that section 1172.6 was unconstitutional. We reversed (*People v. Sult* (May 21, 2020, No. B301288) [nonpub. opn.]), and

---

[1] Undesignated statutory references that follow are to the Penal Code.

2

the trial court on remand, with a new judge presiding, issued an order to show cause and held a hearing on defendant's petition.

Neither the prosecution nor defendant, who was represented by counsel, presented new evidence at the hearing. Instead, and by apparent consent of both sides, the record before the trial court consisted of transcripts of defendant's preliminary hearing and plea and sentencing hearing, the information and abstract of judgment, and documents relating to defendant's previous appeal. A reporter's transcript of the prosecution's case-in-chief at trial could not be located.

### A.  *The Preliminary Hearing Transcript*

The preliminary hearing for defendant, St. Pierre, Zamora, and Salgado was held over four days. (Defendant was ultimately tried with another co-defendant, Randy Johnson (Johnson).) The trial court heard testimony from four witnesses at the preliminary hearing: Raul Arias (Raul), Kenneth Stauffer (Stauffer), Kevin Sackett (Sackett), and West Covina Police Department detective Lee Rossman.

Raul is the older brother of Barbarao "Bubba" Arias. Raul testified that on June 18, 1981, Bubba approached him at his father's house to discuss a plan to "rip off" Lambdin, who sold drugs from his house. Bubba told Raul he had met "some characters" the night before and "talked about doing a rip," but "he was afraid that these guys were going to double cross him or something" and he wanted Raul to talk to them and "see what was going on."

Defendant, Johnson, St. Pierre, and Salgado were waiting outside, and Raul went to talk to them. Johnson told Raul they

did not want any more people involved, and Raul said he was "[t]here just on Bubba's behalf."

Once Zamora joined the group outside Raul's father's house, everyone relocated to a school near Lambdin's house. Johnson bragged about his martial arts skills and his ability to "t[ie] people up" quickly. Raul testified he "mentioned to not only Johnson but the guys that were standing there that, 'You better not have any guns or weapons.'" Johnson replied, "'No, we don't need weapons. We have got black belt Jones here'" (referring to himself).[2] Defendant was part of the group participating in this conversation, and the men stood "[t]wo, three feet away from each other." Raul testified he made his comment about weapons "to all of them in general" but only Johnson responded.

According to Raul, the plan was for Bubba to enter Lambdin's house first, and "if it wasn't cool he was just going to buy . . . dope and go home." A few minutes after Bubba "took off walking around the block," defendant, Johnson, and Salgado followed. A couple minutes after that, Raul walked to Lambdin's house to check on Bubba. When he was across the street, he heard someone screaming. "A lot of people were out there" and he "heard a lot of people [saying], 'Call the police. Call the police.'" Bubba came out and told Raul "it didn't go down right," somebody "brought out a knife," and Lambdin seemed hurt.

Stauffer and Sackett were inside Lambdin's house when Bubba arrived around 9:00 p.m. Stauffer was friends with

---

[2]     When asked whether he heard defendant say no weapons were needed, Raul indicated "Johnson was doing all the talking" and he "really [could not] say" whether defendant made similar comments.

4

Lambdin and testified that Lambdin had sold drugs for several years. Sackett spent several hours at Lambdin's house that day and saw people buying drugs "come and go" with "quite a bit of frequency." There were eight or nine people in the house when Sackett arrived around 3:00 p.m. Stauffer testified that he, Lambdin, and Sackett were the only ones in the house when Bubba arrived and "just started talking with everybody"; Sackett testified one additional person was there at that time. According to Stauffer, about 10 to 15 minutes after Bubba showed up, three men "forced their way inside the house" and "grabbed" Lambdin. Sackett saw the men "wrestle" Lambdin and "thr[o]w him" against a speaker system. Sackett fled when one of the men—not among the three grappling with Lambdin—threatened him with a switchblade knife. Stauffer was stabbed in the forehead and arm as he ran out of the house.

When Stauffer made it outside, he had someone call the police. Sackett testified that Bubba ran out of the house before him and also yelled for someone to call the police. Sackett then returned to the house and stood near Lambdin, who asked for a towel and told others to hide drugs and paraphernalia in his garage.

The parties at the preliminary hearing stipulated Lambdin died of stab wounds to the chest and multiple lacerations. Police found one knife in Lambdin's home. Sackett testified this was not the switchblade with which he was threatened.

Detective Rossman related statements by defendant and his co-defendants during his preliminary hearing testimony. The detective testified defendant told him "the plan was for Bubba . . . to go inside the location, and after approximately ten minutes he, . . . Johnson, and [Salgado] were supposed to go

inside the location, tie the victim up, and take his money and his narcotics." Defendant told Detective Rossman that "Bubba had told him that [Lambdin] was five foot four and very slight of build," but Detective Rossman testified Lambdin was "quite a bit larger" than defendant.

Defendant told Detective Rossman he was first through the door of Lambdin's house. He grabbed Lambdin and slammed him into a speaker unit on the wall of the living room and wrestled him to the floor. Defendant "banged" Lambdin's head on the floor. Lambdin "continued to struggle" as defendant restrained his upper body and Salgado restrained his lower body. After "a few minutes," defendant "looked down and [Lambdin] was saying, 'Help, help' and [defendant] saw a big hole and a patch of blood escaping from [Lambdin's] body." Defendant told Detective Rossman "that [Salgado] was the one that had the knife." Defendant said he too was stabbed during the struggle and suffered a three and half inch cut on his back.

Detective Rossman's testimony regarding statements made by Salgado and St. Pierre was admitted only as to those two co-defendants. Salgado told Detective Rossman he had a knife when he entered Lambdin's house and, when he saw "that the victim had a knife in [defendant's] back," he "went over and grabbed that knife and then stabbed the victim." St. Pierre told Detective Rossman that he drove defendant back to St. Pierre's apartment after the incident, where they were subsequently joined by some of the other men involved in the robbery. After they "cleaned up," the men went to a park to drink beer.

6

*B.    The Plea and Sentencing Hearing Transcript*

Defendant and Johnson were tried together.  At a hearing in April 1982, the trial court expressed its understanding "at this stage of the proceedings that each of [them were] desirous of withdrawing [their] previously entered pleas of not guilty and entering a plea of guilty to the charge of murder . . . in the second degree."  Finding there was a factual basis for defendant and Johnson's guilty pleas, the trial court remarked that it had "heard all of the prosecution case in this matter by way of the testimony and documentary evidence which was introduced," and "the evidence did not sustain a finding that [defendant] or [Johnson] personally murdered—committed the murder, but, clearly, the evidence, at least as of this juncture, [did] sustain a finding that they are guilty on the theory of aiders and abettors or guilty as participants, aiders—either principals or aiders and abettors in a robbery-murder situation."

Defendant and Johnson were sentenced at the same hearing.  The trial court imposed a sentence of 15 years to life in prison and made the following remarks "for the benefit of the Community Release Board":  "[I]t's the Court's view that a minimum sentence at the level of the Department of Corrections should be imposed, as far as each defendant, for the following reasons.  [¶]  First of all, I think the evidence clearly established, in the Court's view, that while the death of Mr. Lambd[i]n, . . . was a natural consequence of the activity which took place in that house, I think it's fairly clear that none of the participants, particularly these two defendants, contemplated that death at the time that they first went in there.  I think the view was that Mr. Lambd[i]n would be subdued and the property and/or narcotics would be taken from him, but not that he would

7

be killed as a result of that activity or that taking. [¶] So that I think that's a factor in mitigation. I am considering their age—[Johnson] is 21 years of age, [defendant] 23 years of age—neither individual appears to be sophisticated in the context of long time or long term criminal activity. [¶] [Defendant], as reflected in the pre-plea probation report, has little prior history of criminality, and none involving—or at least nothing substantial involving any crimes of violence. [¶] . . . [¶] Both defendants when arrested freely and comprehensively admitted their involvement in this particular case. Both defendants made full and complete statements, implicating not only themselves, but crime partners who were involved, which the Court feels is another circumstance in mitigation. [¶] Neither defendant was the person who actually did the stabbing in this matter. It's clear from the evidence that [Salgado], who is still facing charges in this matter, was the person who did the stabbing. [¶] And lastly, I think, also, significantly, one of the co-defendants in this matter, . . . [¶] . . . [¶] [Bubba,] by his own testimony, was the person who more or less organized the entire incident which led to the victim's death, and was a very substantial moving force in getting the robbery planned. [¶] . . . [¶] Further, although this is a very—this was a very violent crime, in the sense that a person was dead or did die as a result of the activity, and I don't want to minimize that death, neither of these defendants appear to be a violent personality. I view the entire crime as situational in nature, and for that reason, also, would recommend to the Department of Corrections that each defendant be housed in either a minimum or medium security facility."

C.    *The Trial Court's Ruling on Defendant's Petition for Resentencing*

In a written order, the court on remand found defendant ineligible for resentencing under section 1172.6 because, in the court's view, he was a major participant in the underlying felony who acted with reckless indifference to human life.[3] As to the major participant element, the trial court found defendant "actively participat[ed] in every stage of [the] robbery," from planning to pinning Lambdin to the floor. As to whether defendant acted with reckless indifference to human life, the trial court's analysis focused on five factors discussed in *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*).

Discussing whether defendant was "ignorant of the knives at the robbery," the trial court stated that Raul "could not confirm whether defendant heard or knew of Johnson's statement" that no weapons would be used in the robbery. The court also went further and suggested there was evidence defendant saw Salgado had a knife before the fatal stabbing. In the trial court's words: "Whether defendant was aware of a plan to bring knives, the evidence supports the conclusion that once he and Salgado wrestled with Lambdin on the floor, he saw Salgado with the knife when he pinned Lambdin's upper body to the floor. In addition to Salgado, at least one other man had brandished a knife in his hand, then used it to attack two other occupants (Sackett and Stauffer . . . ). Rather than prevent the knife

---

[3]    The trial court did not make a finding as to whether defendant was guilty of murder under an implied malice theory or as a direct aider and abettor because the prosecution did not assert either theory in its response to defendant's petition.

9

attacks, defendant viciously beat and restrained Lambdin, while Salgado fatally stabbed him." The trial court emphasized that "[a]lthough there is no evidence that defendant . . . was armed, the evidence strongly suggests that he knew in advance or saw Salgado and possibly a second confederate with a knife when they confronted the house occupants."

Discussing whether defendant was "present at the scene of the killing," the trial court emphasized he "was not only present . . . , he pinned Lambdin's upper body while Salgado stabbed him."

The trial court further determined that defendant had no "reason to trust his cohorts to be peaceable" because "the plan clearly contemplated the use of violence to subdue the house occupants" and "at least one of the men [i.e., Bubba] said that he was 'afraid' of the other men involved in the robbery."

Finally, the trial court found defendant did not "take steps to limit the duration and extent of interaction with innocents so as to minimize risk." To the contrary, the trial court determined "[t]he robbery was not planned for a low-traffic moment," but "9 p.m.[,] when residents are usually home." Moreover, in the court's view, defendant "and two others rushed into the house even though there were multiple occupants inside, strongly suggesting that confronting people inside the house was part of the plan." The court suggested this was an aggravating factor because defendant "could have [instead] knocked on the door and waited for someone to answer" and "demanded drugs and money before resorting to violence." Relatedly, the trial court found defendant did not "make efforts to minimize the risks of violence during the robbery" because the planned robbery was "inherently dangerous," defendant violently tackled Lambdin, defendant "did

10

nothing to prevent Salgado from stabbing Lambdin," and "[r]ather than render[ing] aid to Lambdin . . . , defendant and his confederates left the residence and went to the park to drink beer."

## II. DISCUSSION

Defendant's primary argument on appeal is that he is entitled to relief under section 1172.6 based on the initial trial judge's remarks during the sentencing hearing. According to defendant, these statements either constitute a finding that he did not act with reckless indifference to human life or else represent a view of the evidence to which the section 1172.6 court should have deferred—particularly in light of the missing trial transcript. We need not resolve these contentions because no substantial evidence supports the section 1172.6 court's finding that the prosecution proved beyond a reasonable doubt that defendant acted with reckless indifference to human life.

The preliminary hearing transcript, which is really the only evidence on which the prosecution relied, is insufficient evidence that defendant was aware the planned robbery—in which he and several other men, having sent an advance scout to ensure the coast was clear, were to outnumber and manually overpower their victim—carried a grave risk of death. Indeed, several of the section 1172.6 court's key factual determinations to the contrary cannot be reconciled with the transcript of the preliminary hearing. The trial court's finding, for instance, that defendant may not have heard Johnson's statement regarding weapons is inconsistent with Raul's testimony. The trial court's suggestion that defendant—who was first through the door and immediately locked in a struggle with Lambdin—must have seen that at least

11

one of the men behind him was armed is speculation, not inference. There is also no evidence regarding defendants' knowledge of any of his confederates' propensity for lethal violence. Although, as a general matter, robbing a drug dealer at home presents serious risks of violence, that risk does not satisfy the reckless indifference threshold in this case where there was an advance admonition not to use weapons and defendant and his confederates attempted to reduce the risk by sending Bubba in ahead to ensure things were "cool."

### A. Legal Framework
#### 1. Section 1172.6

"Effective January 1, 2019, the Legislature passed Senate Bill 1437 'to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' (Stats. 2018, ch. 1015, § 1, subd. (f).) In addition to substantively amending sections 188 and 189 of the Penal Code, Senate Bill 1437 added [former] section 1170.95, which provides a procedure for convicted murderers who could not be convicted under the law as amended to retroactively seek relief. [Citation.]" (*People v. Lewis* (2021) 11 Cal.5th 952, 959.)

If the trial court determines a prima facie showing for relief has been made, the trial court must issue an order to show cause. (§ 1172.6, subd. (c).) The trial court must ordinarily hold an evidentiary hearing at which the prosecution bears the burden to prove beyond a reasonable doubt that the defendant is guilty of

12

murder under amended section 188 or 189 as amended by Senate Bill 1437. (§ 1172.6, subd. (d)(3).) "A finding that there is substantial evidence to support a conviction for murder, attempted murder, or manslaughter is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (§ 1172.6, subd. (d)(3).)

The Evidence Code governs at the evidentiary hearing, "except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. . . . However, hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of Section 872 shall be excluded from the hearing as hearsay, unless the evidence is admissible pursuant to another exception to the hearsay rule. The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens."[4] (§ 1172.6, subd. (d)(3).) "If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges." (*Ibid.*)

On appeal from the denial of a petition for resentencing under section 1172.6, we review the trial court's factual findings for substantial evidence. (*People v. Clements* (2022) 75

---

[4] Section 872, subdivision (b) permits a court to make a probable cause finding at a preliminary hearing based on testimony of a qualified law enforcement officer relating the statements of declarants made out of court and offered for the truth of the matter asserted.

Cal.App.5th 276, 298; *People v. Owens* (2022) 78 Cal.App.5th 1015, 1022.)

### 2. *The major participation and reckless indifference to human life standards*

The major participation and reckless indifference to human life standards are derived from the high court's opinion in *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*). (*In re Scoggins* (2020) 9 Cal.5th 667, 674-675 (*Scoggins*).) California's felony murder special circumstance statute incorporates the standards, and this statute is cross-referenced in amended section 189's provision that defendants who were neither actual killers nor acted with the intent to kill may be held liable for murder only if they were "major participant[s] in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (§ 189, subd. (e)(3); *People v. Strong* (2022) 13 Cal.5th 698, 703 (*Strong*) [section 1172.6 "repurposes preexisting law governing felony-murder special-circumstance findings"].)

Until recently, "neither the United States Supreme Court nor California courts offered much guidance about the major participant or reckless indifference standards . . . ." (*Strong*, *supra*, 13 Cal.5th at 705.) Our Supreme Court "first undertook to provide that guidance in [*People v.*] *Banks* [(2015) 61 Cal.4th 788 (*Banks*)]." (*Ibid.*) In *Banks*, the Court considered whether substantial evidence supported a felony murder special circumstance finding where the defendant served as the getaway driver in a marijuana dispensary robbery in which a security guard was killed. (*Banks*, *supra*, at 794-795.) The Court set forth a non-exhaustive list of considerations relevant to determining whether a defendant was a major participant and

14

emphasized that "[r]eckless indifference to human life 'requires the defendant be "*subjectively* aware that his or her participation in the felony involved a grave risk of death."' [Citations.]" (*Id*. at 807.) The Court further emphasized that "knowledge of the possible risk of death inherent in certain felonies (like armed robbery)" does not constitute reckless indifference to human life. (*Id*. at 809.) "Awareness of no more than the foreseeable risk of death inherent in any armed crime is insufficient; only knowingly creating a 'grave risk of death' satisfies" the standard. (*Id*. at 808.)

One year later, in *Clark*, *supra*, our Supreme Court reaffirmed the *Banks* standard for major participation under section 190.2, subdivision (d) and discussed the reckless indifference to human life standard in greater detail. The Court stated, as a general matter, that this element generally "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Clark*, *supra*, 63 Cal.4th at 617.) The Court then set forth a non-exhaustive list of "case-specific factors that [it] and other state appellate courts have considered in upholding a determination of reckless indifference to human life . . . ." (*Id*. at 617-618.) The factors include (1) the defendant's awareness that a gun will be used, whether the defendant personally used a gun (even if not to kill the victim), and the number of guns used; (2) the defendant's physical proximity to the murder and, relatedly, opportunities to restrain the killer or aid the victim; (3) the duration of the felony; (4) the defendant's knowledge "of factors bearing on a cohort's likelihood of killing"; and (5) the defendant's efforts to minimize

the risk of violence during the felony.[5]  (*Id.* at 618-622; see also *Scoggins*, *supra*, 9 Cal.5th at 677 ["Reckless indifference to human life has a subjective and an objective element.  [Citation.] As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' [Citations.]  As to the objective element, "'[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation"'"].)

> **B.** *Substantial Evidence Does Not Support the Section 1172.6 Court's Conclusion that Defendant Exhibited Reckless Indifference to Human Life*

Assuming the record supports the trial court's conclusion that defendant was a major participant in the robbery of Lambdin, it does not support the finding that he acted with reckless indifference to human life.  Like the trial court, we analyze the issue based on the factors discussed in *Clark* and *Scoggins*.  As we now discuss, the "totality of the circumstances" (*Scoggins*, *supra*, 9 Cal.5th at 677) does not support the section

---

[5]    Because the defendant in *Clark* acted as the (abortive) getaway driver in the armed robbery of a retail store during which an employee's mother was shot and killed, the Court framed its discussion around "cases involving nonshooter aiders and abettors to commercial armed robbery felony murders." (*Clark*, *supra*, 63 Cal.4th at 618.)

16

1172.6 court's finding that the prosecution proved defendant acted with reckless indifference to human life.

### 1. Whether defendant was aware Salgado or any other confederate was armed

The section 1172.6 court acknowledged there was "testimony from a witness [Raul] during the preliminary hearing that Johnson told him that no weapons would be needed for the robbery," but the court disregarded this testimony because it believed Raul did not "confirm whether defendant heard or knew of Johnson's statement." The preliminary hearing transcript, however, reveals defendant was part of the group conversation during which Raul and Johnson's statements were made,[6] the men conversing stood two or three feet apart, and Raul testified he addressed his comments about weapons "to all of them in general." Although Raul "really [could not] say" whether defendant himself gave assurances similar to those given by Johnson, the circumstances still strongly indicate the opposite of what the section 1172.6 court found, i.e., that defendant (and, perhaps just as important, the other co-defendants) must have heard the comments discouraging the use of weapons.[7]

---

[6] As recounted earlier in our recitation of the pertinent background, Raul testified he "mentioned to not only Johnson but the guys that were standing there that, 'You better not have any guns or weapons.'" Johnson replied, "'No, we don't need weapons. We have got black belt Jones here.'"

[7] Bubba's statement in the immediate aftermath of the robbery—that "it didn't go down right"—can also be understood as buttressing the conclusion that the use of weapons was not planned.

17

The section 1172.6 court's ruling also concludes that "once [defendant] and Salgado wrestled with Lambdin on the floor, he saw Salgado with the knife when he pinned Lambdin's upper body to the floor." To the extent that the court determined defendant saw the knife before Salgado stabbed Lambdin, the finding is not supported by substantial evidence. Defendant certainly did not admit to seeing Salgado stab Lambdin,[8] and defendant's statement to Detective Rossman "that [Salgado] was the one that had the knife" does not imply that he saw the knife before Salgado stabbed Lambdin. In addition, because defendant was first through the door and immediately started grappling with Lambdin, it cannot be assumed (as the section 1172.6 court did) that defendant was then aware someone stabbed Stauffer or threatened Sackett with a switchblade. Furthermore, insofar as one would credit Salgado's statement to Detective Rossman that he stabbed Lambdin when he saw that Lambdin "had a knife in [defendant's] back," this tends to undercut any speculation that defendant (who was trying to restrain Lambdin's upper body) would have been facing Salgado (who was trying to restrain Lambdin's lower body) and seen a knife.

In our view, and contrary to the section 1172.6 court's reading of the preliminary hearing transcript, there is no non-speculative evidence that defendant knew any of his confederates were armed before Salgado stabbed Lambdin. Defendant was part of the conversation when Johnson assured Raul the group was unarmed and they expressly planned to tie Lambdin up (not

---

[8]     According to Detective Rossman, defendant said "he looked down and [Lambdin] was saying, 'Help, help' and [defendant] saw a big hole and a patch of blood escaping from [Lambdin's] body."

18

kill him). Further, with Bubba going in first to make sure things were "cool," defendant had reason to believe he and the other men would be able to manually subdue a victim Bubba had described as short and slight. (*Banks, supra*, 61 Cal.4th at 811 [no reckless indifference where there was no evidence the defendant had advance knowledge of a need to meet resistance to a robbery with lethal force].) Defendant was not personally armed, and, as we shall discuss in more detail, there is no evidence that he should have suspected Johnson's assurances to Raul were false. Indeed, with respect to this factor, defendant is certainly no more culpable than the defendant in *Clark*, who did not act with reckless indifference to human life despite expecting an accomplice to use an unloaded gun in a robbery. (*Clark, supra*, 63 Cal.4th at 613.)

>2. *Defendant's proximity to the murder and opportunity to restrain Salgado or aid Lambdin*

"Proximity to the murder and the events leading up to it may be particularly significant where . . . the murder is a culmination or a foreseeable result of several intermediate steps, or where the participant who personally commits the murder exhibits behavior tending to suggest a willingness to use lethal force. In such cases, 'the defendant's presence allows him to observe his cohorts so that it is fair to conclude that he shared in their actions and mental state. . . . [Moreover,] the defendant's presence gives him an opportunity to act as a restraining influence on murderous cohorts. If the defendant fails to act as a restraining influence, then the defendant is arguably more at fault for the resulting murders.' [Citation.]" (*Clark, supra*, 63 Cal.4th at 619.)

Presence at the scene of a murder is often a significant factor counseling in favor of a reckless indifference to life finding. In this case, however, there is no evidence that defendant's intimate proximity to the murder afforded him an opportunity to observe and anticipate Salgado's actions. There was no testimony that defendant, Salgado, or Lambdin said anything prior to Salgado stabbing Lambdin and, as we have already discussed, there is no basis to infer that defendant saw Salgado produce a knife before the fatal stabbing. (See, e.g., *People v. Keel* (2022) 84 Cal.App.5th 546, 560 [the defendant did not have "a meaningful opportunity to restrain [his confederate] or intervene before he shot [the victim]" where, among other things, the "decision to shoot was apparently made . . . quickly in response to [the a robbery victim's] unexpected resistance and efforts to flee"]; *In re McDowell* (2020) 55 Cal.App.5th 999, 1014 (*McDowell*) ["A defendant is more culpable when he does nothing to avoid violence despite having time to reflect and consider his options"]; *Scoggins, supra,* 9 Cal.5th at 679 [the defendant lacked control over his confederates' actions "given how quickly the shooting occurred"].)

Defendant's failure to render or summon aid is also not substantially probative of his frame of mind because multiple people—including one of his accomplices—ran out of the house yelling for help and neighbors "came rushing to the house because they heard [Lambdin] screaming." (*McDowell, supra,* 55 Cal.App.5th at 1014 [holding that the defendant's "flight [did] not cut one way or the other given the possibility that [witnesses] would summon aid, which in fact they did"]; *Clark, supra,* 63 Cal.4th at 620 [emphasizing that, "unlike in [*Tison*], [the]

20

defendant would have known that help in the form of police intervention was arriving"].)

The trial court's suggestion that defendant "demonstrated a callous indifference to Lambdin's fatal injuries" by "[leaving] the residence and [going] to the park to drink beer" is based on Detective Rossman's testimony regarding statements by St. Pierre that was admitted only against St. Pierre and should not have been considered. (§ 1172.6, subd. (d)(3) ["[H]earsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of Section 872 shall be excluded from the hearing as hearsay, unless the evidence is admissible pursuant to another exception to the hearsay rule"].) In any event, nothing in St. Pierre's statement to Detective Rossman implies the drinking was celebratory or otherwise probative of a reckless indifference to human life.

### 3.     *Duration of the robbery*

As our Supreme Court explained in *Clark*, "[w]here a victim is held at gunpoint, kidnapped, or otherwise restrained in the presence of perpetrators for prolonged periods, 'there is a greater window of opportunity for violence' [citation], possibly culminating in murder. The duration of the interaction between victims and perpetrators is therefore one consideration in assessing whether a defendant was recklessly indifferent to human life." (*Clark*, *supra*, 63 Cal.4th at 620.) *Clark* cites *Tison*, in which the defendants "'guarded the victims at gunpoint while [the group of perpetrators] considered what next to do,'" to illustrate the principle. (*Ibid.*)

The trial court made no finding as to the amount of time defendant and his confederates who entered Lambdin's home

after Bubba spent inside. Stauffer testified he was out of the house and yelling for help "within 45 seconds." Sackett testified he was out of the house (behind Bubba, who was yelling for help) within "about ten seconds." Defendant told Detective Rossman he struggled to restrain Lambdin for "a few minutes." Whatever the precise duration of the robbery, there is no indication that the murder was a product of prolonged interaction between defendant and his confederates and Lambdin.

### 4. Defendant's knowledge of factors bearing on Salgado's likelihood of killing

"A defendant's knowledge of factors bearing on a cohort's likelihood of killing are significant to the analysis of reckless indifference to human life. [The] [d]efendant's knowledge of such factors may be evident before the felony or may occur during the felony." (*Clark*, *supra*, 63 Cal.4th at 621.) As we have already discussed, there is no evidence that defendant observed Salgado demonstrate a willingness to use lethal force during the robbery before he stabbed Lambdin. There was also no evidence regarding Salgado's prior history of violence (if any) or whether defendant would have been aware of such history through personal acquaintance or reputation.[9]

---

[9] In denying relief, the section 1172.6 court did observe that "at least one of the men said that he was 'afraid' of the other men involved in the robbery." That is a seeming misreading of the preliminary hearing transcript. The court's statement appears to refer to Raul's testimony that Bubba was concerned about being "double cross[ed]" by his confederates—not that he was afraid they would deviate from their plan and harm Lambdin or other witnesses.

22

## 5. *Efforts to minimize risk of violence*

In *Clark*, our Supreme Court emphasized that this factor was relevant to its analysis "primarily because [the] defendant was the principal planner and instigator of the robbery." (*Clark*, *supra*, 63 Cal.4th at 622.) By contrast here, defendant does not appear to have been "the mastermind" (*id.* at 612) of the raid on Lambdin's house. In any case, the fact that Bubba went to Lambdin's house ahead of the rest of the group to make sure everything was "cool" indicates the group was willing to abandon the plan if it appeared they would encounter significant resistance. The fact that Bubba remained in the house for 10 to 15 minutes suggested things were indeed "cool."

The trial court's finding that the timing of the robbery increased the risk of violence because "residents are usually home" at 9:00 p.m. ignores important context about Lambdin's home. Sackett testified there were eight or nine men in the home when he arrived around 3:00 p.m. and drug buyers were "com[ing] and go[ing]" with "quite a bit of frequency" during the day. There were significantly fewer people in the home at the time of the robbery—none of whom, apart from Lambdin, put up any resistance—and no one entered during Bubba's reconnaissance. Under the circumstances, the timing of the robbery did not "elevate[ ] the risk to human life beyond those risks inherent in any armed robbery." (*Clark, supra*, 63 Cal.4th at 623.)

## DISPOSITION

The order denying defendant's petition for resentencing is reversed. The matter is remanded to the trial court with instructions to vacate defendant's murder conviction pursuant to section 1172.6, subdivisions (d) and (e) and to otherwise proceed as required by those subdivisions.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

BAKER, J.

We concur:

RUBIN, P. J.

MOOR, J.

24